NANCY W. ADAMS *vs.* NICHOLAS C. ADAMS.

Middlesex. November 1, 2010. - April 14, 2011.

Present: IRELAND, SPINA, CORDY, BOTSFORD, & GANTS, JJ.

*Divorce and Separation,* Division of property, Child custody, Child support. *Partnership. Value.*

This court lifted an impoundment order entered by the Probate and Family Court in divorce proceedings, to the extent that information contained in this court's opinion was necessary to the resolution of the case, and where there had not been a sufficient showing of good cause justifying its continued impoundment. [362-363] IRELAND, J., concurring in part and dissenting in part, with whom SPINA, J., joined. SPINA, J., concurring in part and dissenting in part, with whom IRELAND, J., joined.

This court concluded that a probate judge hearing a complaint for divorce, acting pursuant to the authority granted by G. L. c. 208, § 34, properly could include in the marital estate, and make subject to equitable distribution, the present value of a spouse's interest in a partnership that produces a consistent profit stream with annual cash distributions; however, where this court discerned clear error in the direct capitalization of income method used for the valuation of the partnership interest, it remanded the case for a recalculation of that value consistent with this opinion. [371-390]

There was no merit to a husband's argument that a probate judge should consider the wife's postseparation conduct to reduce her share of the marital estate. [390-392]

A probate judge was not shown to have abused his discretion in denying a husband's motion to bifurcate the trial of a divorce complaint. [392]

This court declined to consider an abbreviated and conclusory claim that did not rise to the level of appropriate appellate argument. [392]

In proceedings arising from a complaint for divorce, the judge's numerous subsidiary findings strongly supported his conclusion that awarding sole physical custody to the wife was in the best interests of the children [392-393]; further, the judge made no error in the award of child support [393-394].

COMPLAINT for divorce filed in the Middlesex Division of the Probate and Family Court Department on February 15, 2006.

A motion to bifurcate the trial was heard by *Robert W. Langlois,* J., and the case was heard by *Peter C. DiGangi,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*Alan M. Dershowitz* (*Gary Green,* of Pennsylvania, with him) for Nicholas C. Adams.

*Joel A. Kozol* (*Matthew S. Kozol & Meredith A. Rosenthal* with him) for Nancy W. Adams.

*Theodore Tedeschi* for Accretive Capital Advisors LLC & another, amici curiae, submitted a brief.

CORDY, J. Nicholas C. Adams appeals from a judgment of divorce from his wife, Nancy W. Adams, issued by a Probate and Family Court judge.[1] The case has been vigorously litigated, and few, if any, issues stand unchallenged on appeal. The nucleus

---

[1] The entirety of this case was impounded, and all proceedings closed to the public, by order of a judge (not the judge issuing the judgment of divorce) in the Middlesex Division of the Probate and Family Court Department. The husband's employer, Wellington Management Company, LLC (Wellington), of which he is a partner, filed the motion for impoundment, and the wife opposed. The judge made the following indorsement on the face of the motion: "Allowed — entire case and all hearings are impounded and closed, respectively. Motions to unimpound documents or to open hearing(s) will be considered in due course." The judge made no further findings. See Rules 7 and 8 of the Uniform Rules on Impoundment Procedure (LexisNexis 2010-2011) (requiring, inter alia, that impoundment order "may be made only upon written findings," "for good cause shown," and "shall specify the duration of the order").

As provided by S.J.C. Rule 1:15 (2) (b), as appearing in 401 Mass. 1301 (1988), the order of impoundment remained in effect until otherwise ordered by an appellate court. When the opinion in this case was initially released, it did not explicitly address the continued efficacy of the impoundment order. Wellington's counsel alerted the court to that oversight and the opinion was withdrawn to give the parties an opportunity to file additional memoranda addressing the point, which they subsequently did.

While the impoundment order may have been appropriate when entered, at least with respect to financial and other personal materials produced during the discovery process, it carries no continuing presumption of validity, *Republican Co.* v. *Appeals Court.,* 442 Mass. 218, 222-224 (2004), and is plainly not narrowly tailored "so that it does not exceed the need for impoundment," *Boston Herald, Inc.* v. *Sharpe,* 432 Mass. 593, 605 (2000), especially now that a full trial on the merits has been concluded, documents have been introduced in evidence, and important legal issues have been raised and litigated on appeal with respect to that evidence. See *H.S. Gere & Sons* v. *Frey,* 400 Mass. 326, 332 (1987) ("orders of impoundment must comply with the procedures and requirements set out in the [uniform] rules").

Because the information contained in the opinion is necessary to the resolution in the case, see *infra* at 372-390 (and was discussed with specificity by the parties in their appellate briefs), and there has not been a sufficient showing of good cause justifying its continuing impoundment, the order is lifted to the extent of that information. *Republican Co.* v. *Appeals Court, supra* at 223, quoting *Commonwealth* v. *Blondin,* 324 Mass. 564, 571 (1949), cert. denied,

of the husband's appeal, however, is that the judge erred in assigning the present value of the husband's interest in a partnership as defined by G. L. c. 108A, § 6, to the divisible marital estate. We conclude that a judge, acting pursuant to his authority under G. L. c. 208, § 34, properly may include in the marital estate (and make subject to equitable distribution) the present value of an interest in a partnership that, as here, produces a consistent profit stream with annual cash distributions. We also conclude, however, that specific errors in methodology invalidate the valuation of the partnership interest in this case. For that reason, we remand the case for a recalculation of that value consistent with this opinion. In all other respects, the judgment of divorce is affirmed.

1. *Background.* We recite the facts from the trial judge's findings, the report of a special master appointed to value the marital estate, and the evidence adduced from eighteen days of evidentiary hearings before the special master, nine days of trial, 492 exhibits, fourteen chalks and supplements, and a series of stipulations between the parties.[2] We reserve recitation of certain facts as they become relevant to the issues raised.

a. *Home life.* The husband and the wife were married in 1997. The husband was born in 1960; the wife in 1965. Due to the husband's career as a partner in the asset management and investment advisory firm, Wellington Management Company, LLP (Wellington), both the husband and the wife enjoyed an extremely upper-class lifestyle.

After their wedding, the husband and the wife moved into the husband's condominium unit in the Charlestown section of Boston. They eventually purchased a primary residence in Chestnut

339 U.S. 984 (1950) ("The exercise of the power to restrict access to judicial records is to be 'strictly construed in favor of the general principle of publicity' "). See *Globe Newspaper Co.* v. *Pokaski*, 868 F.2d 497, 502, 509 (1st Cir. 1989) (public's right under First Amendment to United States Constitution to access traditionally open proceedings and records preserves its function as "effective check" on judiciary). It would be extraordinary in the circumstances for this court not to identify the parties or discuss the relevant evidence where, among other things, it does not appear that the Supreme Judicial Court has ever failed to do so in a publicly issued opinion reviewing the distribution of a marital estate in a judgment of divorce.

[2] The special master made note: "The case was aggressively tried, at times to a fault, by both legal teams."

Hill. Between the fall of 1999 and spring of 2002, the wife hired and oversaw architects that designed extensive renovations to the Chestnut Hill property. The wife met with contractors almost daily during this project, and the husband provided input. The husband and the wife also owned a home in Florida and real estate in Franklin County, New York. In 2002, the wife frequently traveled between Massachusetts and New York to supervise architectural and decorative remodeling of the Franklin County property. The husband was not involved in that project. After their separation, but prior to the judgment of divorce, the husband purchased both a condominium unit in downtown Boston and a home in Pennsylvania. The wife bought a vacation home in Vermont.

The husband and the wife have four children together. At the time of trial, in 2008, they were all under eleven years of age. The wife was the primary caregiver. She scheduled various appointments and supervised the children's medical needs. The children all required strict oversight of their diets and other special attention for an assortment of allergies and other recurring medical issues. The wife made all meaningful contributions to the children's private school education and after-school tutoring, including walking the children to school daily, assisting with homework, and sitting on the school board. She arranged all extracurricular activities, such as swim, tennis, ballet, violin, and equestrian lessons. The husband was minimally involved in the medical, educational, and extracurricular life of the children.

The wife received an abundance of help with child and home care. When the children were infants, the husband and the wife hired nurses. At the time of trial, the wife employed two full-time nannies, although neither resided at the Chestnut Hill home. The nannies assisted the wife during the day, but not at night. Among the many other domestic staffers, the wife also hired an assistant to prepare hot meals for the family. The wife, either herself or in supervising the domestic staff, was responsible for purchasing the husband's clothing and toiletries, scheduling his medical appointments, obtaining his prescription medications, and various other domestic tasks. The wife paid the household staff through a private company.

The wife was also the financial manager of the marriage. See note 4, *infra*. She arranged and attended all meetings with the

attorneys that would set up the family's estate plan. She settled and served as cotrustee of trusts for the benefit of the children, and purchased stock for them. She maintained records of the family's financial holdings, and provided that information to accountants for annual tax filing. She paid all household bills from a joint account.

In sum, the judge found that the wife was the primary caretaker for the four children, and was responsible for managing the couple's properties, and that the husband contributed little to homemaking and property management. These findings were fully supported in the record.

b. *Career.* After graduating from Princeton University in 1983, the husband began working for Wellington as a research analyst. He ascended through the ranks at Wellington quickly, receiving a promotion to manage a substantial portfolio in 1986, and then to oversee hedge funds. In 1993, the husband was made a partner in Wellington, at which time he contributed capital into the firm and entered into a partnership agreement that governs the rights and obligations of Wellington partners.[3] At the time of trial, the husband managed more than $2 billion in various Wellington investment funds, mostly hedge funds.

After their marriage, the wife supported the husband's career in a ministerial and administrative capacity for several years. Early on, before Wellington provided the husband with an administrative assistant, the wife scheduled his meetings, typed letters and reports, submitted travel receipts and business expense reports, organized his office, and compiled the husband's annual and quarterly reports in accord with Wellington's code of ethics.[4] The judge found that the husband provided "the financial security that the parties have enjoyed."

c. *Income and compensation.* Wellington is a partnership defined by G. L. c. 108A, § 6. Wellington's articles of partnership, amended and restated as of October 25, 2001 (partnership agreement), control the rights and obligations of all Wellington

---

[3]As of June, 2008, Wellington had offices in at least seven countries with 2,025 employees. There were 106 partners.

[4]Prior to the marriage, the wife worked from 1984 until 1992 as an accountant. She earned a license as a certified public accountant, but has not practiced in seventeen years. The license has since expired.

partners, including the apparatus under which the husband receives annual compensation and distributions from the profits of the partnership. The annual cash distributions to Wellington partners, including the husband, is paid in four principal components: (1) salary; (2) incentive compensation; (3) return on capital; and (4) merit distribution.

Under art. XII(b) of the partnership agreement, a three-member managing partners committee sets the first two components of the annual distribution (salary and incentive compensation) and disburses the same to partners specifically "for services rendered to the Partnership." The husband has earned an annual base salary ranging from a low of $105,000 in 1993 to $300,000 in 2008. Incentive compensation is determined by contract. For instance, for the hedge funds he manages, the husband receives a percentage of the base fees and a percentage of the performance fees paid to Wellington by fund investors. Performance fees are received only when the value of a given investment in a fund surpasses its "high water mark," the highest value the investment has previously attained. As such, incentive compensation is anchored not only to the husband's performance but also to the condition of the financial markets, and hence, is quite variable. During the sixteen years preceding the trial, the judge found that the husband's annual incentive compensation varied dramatically from year to year, ranging from a low of $45,262 in 2000 to a high of more than $20 million in 2008.

Article XII(f) of the partnership agreement governs payments of the last two components of the annual distribution, return on capital and merit distribution. Before distributing either, the managing partners committee first determines the annual net available income (NAI) of Wellington. This is the amount of income that exists after the managing partners committee credits the accounts of partners with their salary, incentive compensation earnings, and benefits (art. XII[b] payments); deducts the salaries of all other employees and all various operating expenses; distributes the amounts owed to withdrawn partners; and allocates other reserves required for partnership needs.[5] Though

---

[5] A relatively complex formula for paying out the interest owed to partners who are removed by vote of the partnership or voluntarily withdraw appears in art. XIV of the partnership agreement. See note 9, infra.

denominated as the NAI, this figure represents what would commonly be called the net profits of the partnership. Once the NAI is calculated, the managing partners committee divides these profits into two pools: return on capital and merit distribution payments. The larger of the pools, merit distribution, is apportioned by the managing partners committee in its sole and conclusive discretion. Precatory criteria for apportioning merit distribution are enumerated in art. XII(f) of the partnership agreement, but essentially the managing partners committee attempts to trace the money made for the partnership to each particular partner in the prior year and weight distributions accordingly. The partners committee also considers intangible factors, such as advice the partner provided to the partnership, any mentoring role played, and a partner's esteem in the financial world. The judge found that the husband's art. XII(f) compensation (return on capital and merit distribution) also varied significantly from year to year, ranging (during the same sixteen-year period) from \$135,403 in 1993 to an amount in excess of \$26 million in 2008.

The husband and the wife's annual income was not limited to art. XII(b) compensation and art. XII(f) distributions from Wellington. The husband also received substantial income from numerous hedge funds, brokerage and bank accounts, and other investments.

d. *Irretrievable breakdown.* The husband and the wife, by all appearances, were in a loving relationship until the moment of separation. The husband and the wife communicated affectionately, and the husband demonstrated an apparently genuine acknowledgment and appreciation of the wife's contributions to the marriage. These bonds unraveled rapidly in late 2005. During the Thanksgiving holiday, the husband hosted his cousin as a houseguest at the husband and the wife's home in Florida, and thereafter, at least as early as January, 2006, began a romantic relationship with her. On December 31, 2005, he told his wife of his intent to leave her. In early January, 2006, the husband moved into his sister's home, but he continued communicating with his wife. The husband hired a lawyer for the purposes of obtaining a divorce. The judge found that by February, 2006, when the wife first learned of the husband's extramarital romantic relationship, an irretrievable breakdown of the marriage occurred. She filed her complaint for divorce on February 15, 2006.

e. *Divorce proceedings.* In March, 2006, the husband and wife entered into a stipulation that they would share legal custody of the four children and that the primary residence of the children would be with the wife. The husband later filed a motion to vacate or amend this stipulation. A judge, not the judge issuing the final divorce decree, appointed two separate discovery masters who, in turn, produced fifteen reports. As a consequence, the judge ordered that a trained child care provider be present for the children's visits with the husband. In October, 2006, the husband and the wife further stipulated that the husband would pay the wife $210,000 per month, for her support and the support of the children, throughout the pendency of the divorce action.

On July 26, 2007, another judge issued an order stating, inter alia, as an "Uncontested Issue": "Children will reside principally with" the wife. On December 19, 2007, that judge made several important evidentiary and procedural rulings, including (1) denial of the husband's motion in limine to exclude evidence of the value his Wellington partnership interest that he claimed was "not susceptible to any present value other than zero"; and (2) denial of the husband's motion to bifurcate the trial, and proceed immediately to a judgment of divorce, followed by a trial on the division of the marital estate.

On January 18, 2008, the husband and the wife entered into a stipulation regarding marital assets, which purports to reflect all of the assets comprising the marital estate. Most assets, such as investment accounts and furnishings, were given values as of the dates indicated, but some assets were denominated as "contested." Contested items included the husband's Wellington partnership interest.[6]

On February 21, 2008, after nine days of trial, the trial judge issued an order of reference and appointed a special master to

---

[6]The wife argues, on appeal, that "contested" signifies that the husband had stipulated to the asset's inclusion in the marital estate, but merely contested its value, while the husband argues that he was contesting the asset's inclusion in the estate. Any dispute over whether the husband may have stipulated to assignment of the Wellington partnership interest to the marital estate is inapposite to our review because we conclude that, as a matter of law, the trial judge was vested with discretion to value the partnership interest, assign it to the marital estate, and order its equitable distribution pursuant to G. L. c. 208, § 34. See *infra* at 377-378.

determine the value of the husband's Wellington partnership interest. See Mass. R. Dom. Rel. P. 53 (d) (LexisNexis 2010-2011) (permitting judge to appoint masters with authority to hold hearings and file reports with court). Both parties agreed to the appointment. The special master's hearings lasted eighteen days.

In the months that followed the referral to the special master, the husband and the wife entered into several stipulations agreeing to the value and assignment (to one or the other of them) of all of their real property.

On April 8, 2009, the special master submitted his amended report that appraised the present value of the husband's Wellington partnership at $80,956,975. The husband filed a voluminous objection to nearly every one of the special master's findings, but the judge incorporated the entirety of the special master's report in his judgment of divorce.

f. *Equitable distribution of the marital estate.* The judge determined that this was a twelve-year, mid-length marriage. He found that both parties were in excellent health, and had significant opportunity to acquire future capital assets and income; the wife through investment of her equitable share of the sizeable marital estate, and the husband through his "upwardly mobile, successful track record which renders him exceptionally and lucratively employable for decades to come." In light of the length of the marriage, the husband's financial contribution, and the wife's homemaking contribution to the marital enterprise, and after consideration of all the statutory factors set forth in G. L. c. 208, § 34, including the wife's primary parenting responsibilities of the four young children for many years to come, the judge concluded "an equal distribution of marital assets is most equitable."

Naturally, in an estate as complex as this, determination of which assets constituted property assignable to the marital estate proved difficult. The judge concluded that "assets acquired prior to the marriage shall not be subject to division," but that the wife would take a one-half share of the marital assets acquired during the marriage, regardless of the means of acquisition. The judge required both the husband and the wife to provide a definite value as of the date of marriage to what they claimed to be their respective premarital property.

Accordingly, the husband accounted for and valued in excess of $13 million worth of claimed premarital assets including personal investments, as well as his antiques, carpets, and the automobiles and condominium unit he owned at the time of the marriage. The wife identified a condominium unit that she had purchased for $155,000 and had conveyed to the husband's sister at cost. The judge subtracted the husband's quantified premarital assets and the value of the wife's condominium unit from the divisible marital estate.

i. *Marital estate.* Pursuant to the order of reference, the special master prepared and submitted a schedule of marital assets and their values.[7] As noted, the most vigorously disputed of these was the husband's Wellington partnership interest. As discussed in greater detail, *infra,* the special master found a tax-affected[8] present value of the husband's Wellington partnership interest of $80,956,975, and the judge assigned that value to the marital estate for equitable distribution.

The judge approved the special master's use of the so-called direct capitalization of income method to calculate the value of the principal component of the husband's partnership interest, that is, the present value of the projected future receipt by the husband of a share of Wellington's profits as provided for in art. XII(f) (merit distribution and return on capital). To this value was added the present value of the withdrawal payments the husband was entitled to receive on leaving the partnership as provided in art. XIV of the partnership agreement.[9]

ii. *Child support and alimony.* The judge awarded shared legal custody of the couple's four children to both the husband

---

[7]This schedule included the parcels of real estate owned by the husband and the wife along with their agreed values.

[8]A tax-affected present value is one that has been discounted by the rate of imputed future tax burdens applicable to the future income associated with the partnership interest. See *Bernier* v. *Bernier,* 449 Mass. 774, 775-776 n.2 (2007).

[9]Article XIV requires Wellington to set aside enough NAI each year to make withdrawal payments to retired or withdrawn partners. Simply put, and the formula concededly contains more nuance, the withdrawal payments are disbursed over ten years by creating a coefficient where the fifteen-year performance of the withdrawn partner is the numerator and the fifteen-year performance of other partners is the denominator, and dividing the ten-year projection of company profits by this resultant coefficient.

and the wife. He found it was in the best interests of the children primarily to reside with the wife, and analyzed the wife's financial statements to set the measure of support the children would require to enjoy the lifestyle that existed during the marriage. The wife listed her total estimated weekly expenses as $48,865, and the judge deducted from that figure those expenses he identified as associated with the wife's needs alone. The judge also included eighty per cent (deducting twenty per cent attributable only to the wife as one of five persons living in the residence with the children) of weekly household expenses, such as mortgage payments, taxes, maintenance, utilities, and automobile costs. The judge determined that the total portion of the wife's weekly costs attributable to child care was $27,100 per week ($116,530 per month), and ordered the husband to pay that amount in weekly support.

The judge denied the wife's request for alimony, reasoning that "[i]n consideration of the income and assets she will receive, [the wife] will be able to maintain the lifestyle to which she had been accustomed during the marriage, and, therefore no alimony award . . . is warranted."

The divorce judgment was entered on August 19, 2009. The husband timely appealed from the judgment of divorce and filed an application for direct appellate review in this court, which we granted.

2. *Discussion.* Our review of a judgment pursuant to the equitable distribution statute, G. L. c. 208, § 34, proceeds under a two-step analysis. "First, we examine the judge's findings to determine whether all relevant factors in § 34 were considered." *Bowring* v. *Reid,* 399 Mass. 265, 267 (1987). The second tier of our review requires us to determine whether the reasons for the judge's conclusions are "apparent in his findings and rulings." *Redding* v. *Redding,* 398 Mass. 102, 108 (1986). A judge's determinations as to equitable distribution will not be reversed unless "plainly wrong and excessive." *Id.* at 107. According broad discretion to the judge's division of property pursuant to the § 34 factors "is necessary in order that the courts can handle the myriad of different fact situations which surround divorces and arrive at a fair financial settlement in each case." *Rice* v. *Rice,* 372 Mass. 398, 401 (1977). The husband raises a multitude of

challenges, principally surrounding the judge's distribution of the marital estate and award of child support.[10] We discuss them in turn.

a. *The Wellington partnership interest*. First, we analyze the general propriety of the judge's assignment of the husband's Wellington partnership interest to the marital estate, and then we consider the specific valuation methodology employed by the special master, and by imputation the judge. We conclude that the Wellington partnership interest could permissively constitute a divisible marital asset under § 34; however, we discern clear error in the direct capitalization of income method the special master used to assess its present value.

i. *Assignment to the marital estate*. The husband argues that the Wellington partnership interest was erroneously classified as a divisible marital asset because it constitutes a mere expectancy of future earned income, and as such, is so speculative it resists reduction to a present value. *Drapek* v. *Drapek*, 399 Mass. 240, 244 (1987) (*Drapek*). The husband argues that his merit distributions, the great bulk of his art. XII(f) distributions, are properly characterized as future earned income because testimony adduced from Wellington managers demonstrated that the distributions are reciprocally contingent on his investment performance. Relying on our statement in *Drapek*, *supra*, that future earned income is not subject to equitable assignment under § 34, the husband argues that the judge committed a reversible error of law by holding otherwise. We disagree.

We begin by analyzing the question in light of the plain language of our equitable distribution statute. See *Commonwealth* v. *Boe*, 456 Mass. 337, 347 (2010), quoting *James J. Welch & Co.* v. *Deputy Comm'r of Capital Planning & Operations*, 387 Mass. 662, 666 (1982) ("It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed . . ."). The statute grants judges the authority to exercise a broad degree of discretion in assigning

[10]As the special master and trial judge noted, the husband did a disservice to the interest of efficient expenditure of judicial resources by filing volume after volume of motions, briefs, and opposition memoranda teeming with hyperbole and ad hominem attacks on the competence of the special master, that, at times, offer little attempt to filter those claims objectively lacking merit from those with a sound legal basis.

"to either husband or wife all or any part of the estate of the other, including but not limited to, *all vested and nonvested* benefits, rights and funds accrued during the marriage and which shall include, but not be limited to, retirement benefits, . . . pension, *profit-sharing*, annuity, deferred compensation and insurance" (emphasis supplied). G. L. c. 208, § 34. This language strongly militates in favor of inclusion of the Wellington partnership interest. See *Commonwealth* v. *Rahim*, 441 Mass. 273, 274 (2004), quoting *Gurley* v. *Commonwealth*, 363 Mass. 595, 598 (1973) ("Where the language of a statute is plain, it must be interpreted in accordance with the usual and natural meaning of the words"). Not only does § 34 expressly permit assignment to the marital estate of a spouse's "profit-sharing" arrangements, which, by necessity, must include distribution of a partnership's surplus profits, but also allows present distribution of a wholly or partially nonvested future benefit. Moreover, pursuant to § 26 of G. L. c. 108A, the partnership statute under which Wellington is organized, expressly defines a "partner's interest in the partnership" as "his share of the profits and surplus," and denominates the same as "personal property." See G. L. c. 208, § 34. We read the partnership statute as support for the proposition that a partnership interest fits squarely within the ambit of the "profit-sharing" language in the equitable distribution statute. See G. L. c. 108A, § 26; G. L. c. 208, § 34. Construing § 34 in whole, and in tandem with the partnership statute, as we must, we discern no language that would proscribe, in otherwise appropriate circumstances, the assignment of the present value of a spouse's interest in a partnership to the divisible marital estate. *First Nat'l Bank* v. *Bernier*, 50 Mass. App. Ct. 756, 759 (2001), quoting *Selectmen of Topsfield* v. *State Racing Comm'n*, 324 Mass. 309, 312-313 (1949) ("We also construe each clause or phrase with reference to every other clause or phrase so that 'all parts shall be construed as consistent with each other so as to form a harmonious enactment' ").

Similarly, as we have stressed, our jurisprudence "has not been bound by traditional concepts of title or property (even those not within the complete possession or control of their holders) to be part of a spouse's estate for purposes of § 34." *Baccanti* v. *Morton*, 434 Mass. 787, 794 (2001) (*Baccanti*), quoting *Lauricella* v. *Lauricella*, 409 Mass. 211, 214 (1991).

The inquiry does not end there, however. Despite the broad definition of marital property in § 34, and the abundant discretion the statute entrusts to trial judges, we have drawn a line around certain interests that are so speculative as to constitute nothing more than expectancies, and thus, are not assignable to the marital estate. See *Drapek, supra* at 244; *Yannas v. Frondistou-Yannas*, 395 Mass. 704, 714 (1985); *Davidson v. Davidson*, 19 Mass. App. Ct. 364, 374 (1985). In *Drapek, supra*, we adopted the proposition advanced by other courts that "the present value of future earned income is not subject to equitable assignment" under § 34. We reversed a trial judge's classification of a medical degree and license as a marital asset because "assigning a present value to a professional degree would involve evaluating the earning potential created by that degree." *Drapek, supra.* Similarly, in *Yannas v. Frondistou-Yannas, supra*, we declined to characterize the present value of a grant of a patent as a divisible asset because any enhanced earning potential the patent created was merely speculative. See also *Davidson v. Davidson, supra* at 374-375 (anticipated inheritance from living testator unassignable to marital estate).

In the circumstances of this case, the husband's reliance on *Drapek* is misplaced. As articulated in art. XII(b) of the partnership agreement, Wellington pays the husband annual salary and incentive compensation, and that represents his future earned income. Here, the special master, and by extension the judge, expressly excluded the husband's future earned income, as provided in art. XII(b), from his computation of the present value of the Wellington partnership interest (see *infra*), and, consequently, did not contravene the rule against distribution of future earned income in *Drapek, supra.*

Nor is an interest in a partnership so ineffably speculative that it resists present valuation. The value of an interest in a partnership is distinguishable from the expectancies at issue in *Drapek* and its progeny. Expectancies, unlike partnership interests, do not embody either a present or future enforceable proprietary right or reflect a steady record of past distributions of income that facilitates a reliable assessment of the asset's present value. For instance, a medical degree, and concomitantly professional licensure, grants a putative doctor the simple right to practice medicine, not an entitlement to inclusion in a medical business organization and a

share of its prospective profits. By contrast, an interest in an established partnership, though subject to degrees of uncertainty and the contingency of future performance, has more than theoretical value.

To that end, a partnership interest is akin to other inchoate or uncertain assets we have assigned to the marital estate consonant with § 34. In *Bernier* v. *Bernier*, 449 Mass. 774, 777 & 779 n.10 (2007) (*Bernier*), "[t]he engine of the parties' financial success" were two supermarkets, organized as close corporations, on Martha's Vineyard, and managed almost exclusively by the husband. We stated, in a context not dissimilar from this one, that "where valuation of assets occurs in the context of divorce, and where one of the parties will maintain, and the other be entirely divested of, ownership of a marital asset after divorce, the judge must take particular care to treat the parties not as arm's-length hypothetical buyers and sellers in a theoretical open market, but as fiduciaries entitled to equitable distribution of their marital assets." *Id.* at 775-776. Although we recognized that "valuation of any closely held corporation is fraught with uncertainties, and thus difficult to accomplish with precision and consistency," *id.* at 783 n.16, we indorsed the general methodology adopted by the judge to achieve the goal of an equal division of the present value of the corporations. See *id.* at 778. Our courts have upheld the equitable distribution of the present value of other noncorporate business interests. See *Adlakha* v. *Adlakha*, 65 Mass. App. Ct. 860, 863 (2006) (wife's private practice as physician attributed to marital estate); *Sampson* v. *Sampson*, 62 Mass. App. Ct. 366, 367-368 (2004) (*Sampson*) (marital assets included $175,000 present fair market value of wife's insurance agency based on "capitalized income" [direct capitalization of income] method).

Further, in *Baccanti, supra* at 796-797, we held that the present value of nonvested stock options may be included in the divisible marital estate. We reasoned that neither the uncertainty of the stock options' value when ultimately realized nor the prospect that their value would fall below the minimum threshold at which options could be exercised precluded the judge's classification of the options as divisible marital assets under § 34. *Id.* at 795-796. We also ruled that the contingency of vesting on

continued employment did not bar assignment to the marital estate. *Id.* We concluded that stock options, like real estate and stock that are routinely assigned to marital estates, "are also subject to fluctuations in value based on varying economic factors beyond either party's control." *Id.* at 795. Similarly, in *Dewan* v. *Dewan*, 399 Mass. 754, 755, 760 (1987) (*Dewan*), we declined to disturb the judge's award of thirty per cent of the husband's nonvested retirement pension benefits to the wife. See *Sampson, supra* at 367 (present value of husband's nonvested pension, assuming retirement at age fifty-five years, awarded to marital estate).

These, and other cases, stand for the proposition that we are unwilling to deny one spouse, who contributed to the acquisition or appreciation of property during the marital enterprise, "the right to share in what 'may be the most valuable asset between the spouses' " on the basis of the uncertainty or future contingencies bound up in that asset. *Baccanti, supra* at 796, quoting Curtis, Valuation of Stock Options in Dividing Marital Property Upon Dissolution, 15 J. Am. Academy of Matrimonial Law 411, 411-412 (1998). See *Dalessio* v. *Dalessio*, 409 Mass. 821, 825-826, 829 (1991) (annuity purchased by husband from proceeds of structured settlement in tort claim to be paid years beyond dissolution within assignable estate); *Lauricella* v. *Lauricella*, 409 Mass. 211, 216 (1991) (beneficial interest in real estate trust with spendthrift clause and contingency of survivorship is present, enforceable, and equitable right to use property, and as such, marital asset); *Hanify* v. *Hanify*, 403 Mass. 184, 187-188 (1988) (*Hanify*) (interest in pending lawsuit is "chose in action"[11] and "[c]hoses in action, rights and other interests, the benefits of which may be receivable now and in the future" attributable to marital estate). "The fact that valuation of the interest may be difficult does not alter its character as a divisible asset . . . ." *Lauricella* v. *Lauricella, supra* at 217. To hold otherwise would frustrate the intent of the Legislature in so broadly drafting § 34. See *Baccanti, supra.*

What emerges from an analysis of these cases is a fine distinction between an indivisible expectancy and a partnership interest

---

[11]A "chose in action" has been defined as a "proprietary right in personam, such as a debt owned by another person, a share in a joint stock company, or a claim for damages in tort." Black's Law Dictionary 275 (9th ed. 2009).

like the one at issue here. Expectancies have only theoretical value, while here, the husband's Wellington partnership interest, though subject to variability, entitles him to a share of a large profit pool. That partnership interest encompasses a composite of both a reasonably predictable stream of future distributions (art. XII[f]) based on the consistency of past distributions of partnership profits, and an enforceable contractual right to future distributions on withdrawal or retirement (art. XIV). Though non-vested, the art. XIV withdrawal payments (made over ten years) are indistinguishable from the inchoate retirement pension or stock options assigned to the marital estate in *Baccanti, supra*; and *Dewan, supra*; and, the husband's art. XII(f) distributions were properly characterized by the trial judge as his annual share of the partnership's surplus profits. Though tied partially to the success of the hedge funds he manages, and undeniably susceptible to the variability of financial markets, the husband's sixteen-year performance as a Wellington partner provides watermarks for the distributions of partnership profits he received in poor-performing and high-performing years.[12] The special master rightfully incorporated both the swells and swoons of the husband's art. XII(f) distributions in his "studied prognostication" of the present value of the husband's Wellington partnership interest. Moreover, Wellington as an entity has an even longer record from which to build strong predictions of future annual partnership profits and the percentage that will be distributed to the husband. Having determined that the Wellington partnership interest is not an expectancy, we also read *Bernier, supra* at 775-776, to encourage its inclusion in the marital estate. There, "where one of the parties will maintain, and the other be entirely divested of, ownership of a marital asset," we allowed the judge to divide properly and distribute equitably the present value of that asset. *Id.* That is what the judge attempted here.

For all the foregoing reasons, we agree with the special master, who stated that a partnership interest, such as the husband's

---

[12]The special master concluded that although the husband's merit distributions were linked to performance, the art. XII(f) payments "will not be governed solely by the earnings he generates for Wellington through the funds he manages but by his overall contribution to the firm and the relatively good results of the portfolios for which he is responsible. Otherwise said, the profit distribution is not simply on an 'he eats what he kills' basis."

stake in Wellington, "that so consistently generates cash flow, has dollar value which may be expressed by capitalizing the average profit distribution over a period of time." That venerable and widely accepted rule of appraisal can be extended into a legal proposition. Accordingly, we hold that a divorcing spouse's interest in a partnership that produces a consistent stream of profits, and reliably disburses those profits to the partner spouse over a period long enough to appraise the present value of the partnership interest fairly, is, in the discretion of the judge, assignable to the marital estate if its inclusion would achieve a fair financial settlement. See G. L. c. 208, § 34; *Bernier, supra* at 776-777 (2010); *Rice* v. *Rice,* 372 Mass. 398, 401 (1977).

We underscore some limiting principles to the future application of this proposition. First, § 34, in addition to enumerating mandatory factors that a judge must consider in dividing the estate,[13] vests a judge with discretion to consider the "contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates and the contribution of each of the parties as a homemaker to the family unit." G. L. c. 208, § 34. See *Baccanti, supra* at 797, citing *Heins* v. *Ledis,* 422 Mass. 477, 480 (1996); *Heacock* v. *Heacock,* 402 Mass. 21, 24 (1988) (purpose of division of marital property is "to recognize and equitably recompense the parties' respective contributions to the marital partnership"). A judge may properly weigh whether the divested spouse contributed directly, or indirectly through homemaking, to the accrual of the partnership asset during marriage. See *Baccanti, supra* at 793; *Heacock* v. *Heacock, supra.* Although it is not the case here, there may be some cases where those contributions are minimal, or some marriages of such short duration, that judges may elect not to divide the value of one spouse's partnership interest on dissolution.

Second, judges must take due note that property assignments, unlike alimony, cannot be modified. See G. L. c. 208, § 37; *Drapek, supra* at 244. There are many factors that might render it inequitable to assign the present value of a partnership interest to the marital estate. In consideration of the fact that the

---

[13]These include, inter alia, the parties' conduct during the marriage, the length of their marriage, their ability to obtain future income and assets, and the needs of any dependent children. G. L. c. 208, § 34.

present value of a partnership interest incorporates an assumption of maintaining the partner's future work efforts, judges should also weigh the health and productivity of the partner spouse. See *Baccanti, supra* at 802; *Hanify, supra* at 188-189; *Drapek, supra* at 243-244. Our holding today is not intended to serve as a means of compelling a divorcing spouse into effective servitude. Particularly where the partnership interest has not produced profits or distributions of those profits in as consistent and routinely extraordinary a manner as the husband's Wellington partnership interest, the judge should be mindful that an award of alimony, subject to future adjustment, or a distribution of the estate on an "if and when received" basis might be preferable. See *Baccanti, supra*; *Hanify, supra* at 189; *Drapek, supra.*

Indeed, judges are permitted to exercise their discretion to order that future recovery or payment of a partnership interest, as we have allowed with stock options, pensions, and choses in action, be divided, "*if and when received,* according to a formula fixed in the property assignment" (emphasis supplied).[14] *Hanify, supra* at 188. See *Baccanti, supra*; *Dewan, supra* at 757-758.

We briefly address another argument advanced by the husband on appeal. The husband contends that, even assuming the Wellington partnership interest "however defined, and whatever it may be worth," was legally assignable to the marital estate, the judge erred in including it in the marital estate under the "law of the case," because he expressly stated in his judgment: "assets acquired prior to the marriage shall not be subject to division." Because the husband became a partner in 1993, some four years prior to his marriage, he argues that the Wellington

---

[14]We have, however, cautioned that "a present division of all assets ordinarily is preferable," because it provides an immediate settlement of the distribution without entangling the parties in future litigation, and the continued strife and uncertainty it entails. *Hanify* v. *Hanify,* 403 Mass. 184, 188 (1988), citing *Dewan* v. *Dewan,* 399 Mass. 754, 755-758 (1987) (*Dewan*). We have also recognized that while the award of a future benefit on an "if and when" received basis avoids the nettlesome problem of present valuation, it may place the employee spouse in a position to manipulate, impair, or delay the divorced spouse's receipt of the benefit. *Dewan, supra* at 757-758. However, even with those considerations in mind, where a present valuation of an inchoate interest would provide hardship on either spouse, that may operate as a "controlling factor," and the "if and when" received distribution method becomes a viable option. See *id.*

partnership interest is a premarital asset. The husband fails to acknowledge that the judge specifically requested a schedule with definite values, as of the date of the marriage, of the husband's claimed premarital property, and the husband failed to list or provide a computation of the premarital value of the partnership. The husband did not present expert testimony about the value of his Wellington partnership interest at the time of marriage, nor did he offer in evidence Wellington's financial statements or then-existing partnership agreement. Consequently, there was no error in the judge's ruling that the value of the partnership was includable in the marital estate and that the husband's premarital assets totaled $13,444,671 (see *supra*). Even still, it is the well-settled foundation of domestic relations law, despite the husband's attempts to apply a sui generis "law of the case," that a trial judge has "discretion to assign one spouse the property of the other spouse whenever and however acquired."[15] *Rice* v. *Rice, supra* at 400. In other words, a judge may assign to one spouse property acquired prior to marriage by the other. *Id.* The judge also expressed this principle in his conclusions of law. There was no abuse of discretion in his doing so here.

ii. *Valuation methodology.* Having decided that G. L. c. 208, § 34, permitted the judge to assign the present value of the husband's partnership interest to the marital estate, we must turn to the thornier issue of what constitutes proper valuation methodology. Valuation of a business interest is a question of fact. *Bernier, supra* at 785, citing *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 541 n.47 (1997). The standard of review to be applied is whether the judge's findings were clearly erroneous. Mass. R. Civ. P. 52 (a), as amended, 423 Mass. 1402 (1996). When the opinions of valuation experts diverge, a judge may "accept one reasonable opinion and reject the other." *Fechtor* v. *Fechtor*, 26 Mass. App. Ct. 859, 863 (1989). The

---

[15]The husband also argues that the judge erred in including in the marital estate merit and incentive distributions purportedly allocated to the husband prior to marriage, but paid in 1997 and 1998 after the marriage. The judge's statement of his intention to exclude premarital assets from the divisible estate does not vitiate the discretion otherwise granted to him by § 34 to distribute any asset "whenever and however acquired." *Rice* v. *Rice,* 372 Mass. 398, 400 (1977). Therefore, the judge's inclusion of distributions paid to the husband during marriage, but earned before, even if such payment is properly characterized as a premarital asset, was plainly not an abuse of discretion. See *id.*

judge may also "reject expert opinion altogether and arrive at a valuation on other evidence." *Id.* The judge "may not, however, reach a valuation that is materially at odds with the totality of the circumstances or, in the case of divorcing spouses, at variance with the requirements of the equitable distribution statute. G. L. c. 208, § 34." *Bernier, supra.* See C.P. Kindregan, Jr., & M.L. Inker, Family Law and Practice § 45:8, at 334-335 (3d ed. 2002).

The consensus approach to valuation deployed by appraisers and experts in marriage dissolutions has coalesced around some variation of what is known as the "income approach." S.P. Pratt, R.F. Reilly, & R.P. Schweihs, Valuing Small Businesses and Professional Practices 724-725 (3d ed. 1998). See *Bernier, supra* at 778 n.7. The income approach rests on the proposition that "[i]n theory, the value of a business or an interest in a business depends on the future economic benefits that will accrue to that business, with the value of those future benefits being discounted back to present value at some appropriate discount rate." S.P. Pratt & A.V. Niculita, Valuing a Business: The Analysis and Appraisal of Closely Held Companies 175 (5th ed. 2008). "In other words, the basic concept of the income approach is to project the future economic income associated with the investment and to discount this projected income stream to a present value at a discount rate appropriate for the expected risk of the prospective income stream." *Id.* In *Bernier, supra* at 778, both the husband's and the wife's experts used the direct capitalization methodology of the income approach.[16] Here, the special master employed the same methodology. Generally speaking, the direct capitalization of income methodology first determines the average normalized pretax income of a business entity. See S.P. Pratt, R.F. Reilly, & R.P. Schweihs, Valuing Small Businesses and Professional Practices, *supra* at 256. This normalized expectation will reflect deductions (for salary, nonrecurring income, expenses) and any other adjustments necessary properly to account for risk and other economic factors. See *id.* The normalized average income is then divided by an appropriate capitalization rate to discount to present value. *Id.*

---

[16]This is also called the "capitalized economic income" method. S.P. Pratt, R.F. Reilly, & R.P. Schweihs, Valuing Small Businesses and Professional Practices 254-257 (3d ed. 1999).

An alternate methodology, also included within the income approach, is known as the discounted cash flow methodology. In our view, this methodology is better suited for valuing an individual's interest in a partnership. Unlike the direct capitalization of income approach, which assumes a perpetual stream of income, the discounted cash flow method uses a more complex equation to reduce a finite period of future income (here, fourteen years of distribution before retirement, and ten years of withdrawal payments thereafter) to present valuation. See S.P. Pratt & A.V. Niculita, Valuing a Business: The Analysis and Appraisal of Closely Held Companies, *supra* at 177; S.P. Pratt, R.F. Reilly, & R.P. Schweihs, Valuing Small Businesses and Professional Practices, *supra* at 213, 257-258. The special master, and the judge adopting his findings, should have employed that methodology here.

(1) *The wife's expert.* At the special master hearings, the wife called Gregory Cowhey, managing director of the valuation services group at Wealth & Tax Advisory Services, Inc., a national financial firm, and he was qualified as an expert witness in business appraisal. Cowhey testified to the contents of reports that he prepared to appraise the present value of the husband's Wellington partnership interest. The reports were entered in evidence. Cowhey used the discounted cash flow methodology to value the stream of profits and withdrawal payments the husband would likely receive, and then applied the tax affecting formula we indorsed in *Bernier, supra* at 787-790. He wrote in his report that rather than applying a market rate approach, e.g., valuing Wellington as a commodity, and calculating the share of the theoretical sale price the husband would receive as a partner, the best methodology would fix the "present value of the expected future cashflow distributable" to the husband from the date of preparation of the expert report until the husband's retirement from the firm.

More precisely, Cowhey first applied labor and census statistics and various actuarial models to predict that the husband would retire in fourteen years at sixty-two years of age (a prognostication that the husband does not contest). Next, he projected annual cash distribution to the husband through age sixty-two, based solely on art. XII(f) distributions, that is, on the husband's

merit distribution and return on capital, excluding projected art. XII(b) salary and incentive compensation. Cowhey determined that the three-year period just prior to the trial (from 2006 to 2008) marked the most representative historical period from which to predict future partnership distributions. The effect of selecting this high watermark period of Wellington's profitability resulted in Cowhey's projecting that the husband's annual art. XII(f) distributions would average approximately $27 million over the next fourteen years. To this amount, Cowhey then applied a growth rate of four per cent and various discount variables. Next, Cowhey discounted the distributable income to present value by applying a discount rate that adjusted for the finite, fourteen-year span of the husband's future prewithdrawal income stream.[17] He then computed the present value of the husband's withdrawal payment, that would be paid out over a ten-year period after he retired at age sixty-two, as provided by art. XIV of the partnership agreement. See note 9, *supra.* He projected that this latter payout would equal 2.93 per cent of the gross available income of Wellington, which he based on his projections in valuing Wellington as a whole, during the ten-year period of the withdrawal payments. These projections were premised on an assumption that Wellington would have available income equal to that available to it in 2007. Finally, Cowhey tax affected the future cash flow at a rate of 31.5 per cent for the art. XII(f) distributions, which approximated the average of the husband's effective income tax rate for the three representative years (2006-to-2008). In tax affecting the art. XIV withdrawal payment, Cowhey applied the highest marginal tax rate of 38.5 per cent, assuming the payout would be classified under the Internal Revenue Code as "guaranteed payments." Ultimately, Cowhey presently valued the husband's Wellington partnership interest at between $134 million and

---

[17]The discount rate consisted of two components, a time value of money factor (that we understand to be synonymous with a projected rate of return) and a morbidity factor. Cowhey set the rate of return at 8.25 per cent, which represented Wellington's borrowing rate in 2008. He also discounted downward by applying a risk of morbidity variable. Cowhey discounted by the "survivor rate," which was the probability that a man similarly situated to the husband would be able to live and work past the age of sixty-two. He utilized mortality statistics compiled by the United States Centers for Disease Control.

$145 million, which included a present valuation of the art. XIV withdrawal payment of $11,580,000.[18]

(2) *The husband's expert.* At the special master's hearings, the husband steadfastly maintained that his Wellington partnership interest had no present value other than his art. XIV withdrawal payment, or in the alternative, that any equitable distribution of the value attributed to the partnership be paid out "if and when received." The husband declined to offer expert testimony as to the present valuation of his Wellington partnership interest, aside from the value of his art. XIV withdrawal payment. His expert witness, David M. Gannett, assessed the present value of the ten-year withdrawal payment, commencing at the time of trial (and not fourteen years hence as the wife's expert had assumed) at between $28,453,000 and $39,713,000, after applying an income tax affecting rate of forty per cent.

(3) *Special master's approach.* The special master prefaced his report by noting that "[c]apitalization of profit distribution is an accepted method of valuing a business interest."[19] The special master credited the husband's own statements that he had no plans to withdraw as a partner of Wellington, and found Cowhey's prediction that the husband would work until age sixty-two, "a sound actuarial forecast." In projecting future partnership distributions the master (like Cowhey) weighted only art. XII(f) distributions (not art. XII[b] salary and incentive compensation), but unlike Cowhey, input into the projection formula all such distributions since the husband became a partner in 1993, not just those during the period 2006-2008. He reasoned that the "history of the securities market as demonstrated even in the [sixteen]-year period of [the husband's] partnership at Wellington, i.e. 1993-2008, discloses not a steady upward curve but periods of decline. . . . The economy is notoriously cyclical." The special master stated: "I cannot, on the basis of the severe economic

[18]Cowhey also calculated the present value of Wellington, as a whole, after applying the direct capitalization methodology with a four per cent growth rate, a seven per cent capitalization rate, and tax affecting by deducting a "pre-dividend" tax rate of 24.5 per cent. This was an attempt to replicate the *Bernier* methodology approved by this court for valuation of close corporations. The value he reached was $9.09 billion.

[19]This is the direct capitalization of income methodology referred to, *supra* at 381.

recession of which I am bound to take judicial notice, assume that [the husband] shall receive the same high level of merit distribution that characterized calender years 2004 through 2007."

After concluding that he would incorporate the sixteen years of art. XII(f) distributions through 2008, the special master calculated that, since 1993, the merit portion of the husband's art. XII(f) distribution averaged three per cent of Wellington's annual NAI.[20] However, "in light of current economic circumstances," and "current governmental and public concern" about the profits of money managers, the special master applied a lower, two per cent share as the predictive factor. The special master then predicted what Wellington, as a whole, would earn in NAI in 2009. He reached that figure first by noting that Wellington has consistently underestimated its NAI projections this decade. Taking Wellington's predicted NAI for 2009, the special master applied the lowest (i.e., least underestimated) historical underestimation of fifty-nine per cent. Predicting that the securities market was likely to remain flat through 2010, the special master projected an identical NAI for 2010. Next, applying the two per cent share of NAI to the projected NAI for 2009 and 2010, the special master predicted a baseline merit distribution to the husband of $5,728,000 in each of those two years. In view of the downward trend in the securities market at the time, the special master also rejected Cowhey's four per cent rate of growth, and applied a three per cent growth factor to the husband's baseline $5,728,000 in merit distribution for the next fourteen years until his anticipated retirement. As for return on capital, the other component of the two-pronged art. XII(f) distribution, the special master found it "conservative" to project a $600,000 return on capital each year until the husband retired at age sixty-two. In sum, applying the two per cent share of NAI with a three per cent growth factor to the husband's 2009 and 2010 projected compensation, the special master predicted that the husband would average $6,799,050 in merit distribution each year until 2022, plus $600,000 in return on capital, for a total annual projected art. XII(f) income stream of $7,399,050. Applying the direct capitalization of income approach, the same used in *Bernier*

[20]The Wellington reports relied on by the special master to reach this figure do not include return on capital, and as such, do not measure the entirety of art. XII(f) payments as a percentage of Wellington NAI.

to assess the present value of a close corporation, the special master then capitalized the value of that annual stream of income by dividing the $7,399,050 projected income stream by an 8.5 per cent capitalization rate. This resulted in a capitalized present value of the total annual art. VII(f) distributions of $87,047,647.

The special master then tax affected the $87,047,647 capitalized partnership value by combining and applying the current Federal capital gains tax rate (rather than the income tax rate) of fifteen per cent, and the Massachusetts capital gain tax rate of 5.3 per cent, for a total tax affected present value of $69,376,975. Finally, the special master accepted Cowhey's present value computation of the art. XIV withdrawal payments of $11,580,000. Adding the art. XIV withdrawal payment, to the tax affected present value of the annual art. XII(f) distributions, the special master appraised the husband's partnership interest at a present value of $80,956,975.[21]

(4) *Review of the special master's methodology.* We acknowledge, as we did in *Bernier, supra* at 783 n.16, that valuation of a partnership interest is an inexact science. Because the process is "fraught with uncertainties," we only reverse a judge's findings for commission of clear error, or if the methods used "would clearly produce an arbitrary result." *Id.* at 783 n.16, 787. Mass. R. Civ. P. 52 (a). We do not discern clear error in the judge's adoption of the special master's seemingly conservative projections of the husband's future income stream.[22] However, we conclude that the method used by the special master, and accepted without modification by the judge, was clearly erroneous in two significant respects. Thus, the projected value was "materi-

[21]As a check on the reasonableness of this valuation, the special master appeared to accept Cowhey's $9.09 billion computation of the fair market value of Wellington as a whole, see note 18, *supra,* and calculated that under art. XVIII of the partnership agreement, the husband would receive a one per cent distribution on gross profit in the event of a sale of Wellington. Thus, he projected that the husband's partnership interest would be worth approximately $90 million under a market rate formula.

[22]For instance, the special master carefully considered the report of the wife's expert, and, as may have been appropriate, adjusted numerous projections downward. He thoughtfully accounted for the current decline in the securities market, and rejected the presumption of wife's expert that the outlying years of 2006 to 2008, where a bubble in the securities market helped inflate the economy, marked the most representative historical period to predict husband's future partnership distributions.

ally at odds with the totality of the circumstances." See *Bernier, supra* at 785. For the reasons discussed *infra*, we must remand the case for a recalculation of the present value of the husband's Wellington partnership interest.

First, as noted, *supra*, the special master decided to use the direct capitalization of income method. This method is the preferred accounting formula for valuing corporations, stocks, and other similar interests. It is appropriate for the valuation of interests in corporations, in particular, because the formula presumes the perpetuity of a future income stream, and corporations are defined, in part, by their infinite existence. S.P. Pratt, R.F. Reilly, & R.P. Schweihs, Valuing Small Businesses and Professional Practices 257 (3d ed. 1998). See *Associated Indus. of Mass.* v. *Attorney Gen.*, 418 Mass. 279, 285 (1994) (noting corporations enjoy advantages under law such as limited liability and perpetual life). It was, however, error to use that method in this case because the husband's Wellington partnership interest was delimited by a finite period of cash flow. The Wellington partnership interest, as defined by the special master, had two components: the annual stream of art. XII(f) distributions for the fourteen years prior to his expected retirement in 2022, and the amount of his art. XIV withdrawal payment. With respect to the husband's art. XII(f) profit distribution, it effectively ceases when he leaves the partnership. See G. L. c. 108A, § 24. Because the use of the direct capitalization of income method presumes perpetuity of income, and does not account for the finite fourteen-year period of cash flow, the special master's formula, as adopted by the judge, may have overvalued the husband's Wellington partnership interest. See S.P. Pratt & A.V. Niculita, Valuing a Business: The Analysis and Appraisal of Closely Held Companies 177 (5th ed. 2008); S.P. Pratt, R.F. Reilly, & R.P. Schweihs, Valuing Small Businesses and Professional Practices, *supra* at 213, 257-258. The special master should have elected to employ some variant of the discounted cash flow method, which discounts each discrete year's income stream, and thereby more accurately reduces a finite period of future cash flow to present valuation.[23] See *id.*

---

[23]In other words, the present value of an infinite cash flow averaging a set amount is greater than the present value of that same cash flow limited to a fourteen-year period.

Second, the special master appears to have committed clear error in accepting, unmodified, the present value of the art. XIV withdrawal payment suggested by the wife's expert. The special master had authority to "accept one reasonable [expert] opinion and reject" others. *Fechtor* v. *Fechtor,* 26 Mass. App. Ct. 859, 863 (1989). However, in projecting the husband's future art. XII(f) distributions, the special master expressly rejected several assumptions made by the wife's expert, and, in turn, adjusted downward several variables that the expert used to reach a present value of that component of the Wellington partnership interest. Nonetheless, later in his report, the special master accepted, without any adjustment, the computation of the present value of the art. XIV withdrawal payment determined by the wife's expert that incorporated many of the same variables and assumptions that the special master had previously rejected as inaccurate in the context of the art. XII(f) distributions.[24] On remand, the judge (or special master) should recalculate the present value of the husband's Wellington partnership interest, applying consistent figures to the same variables in the formulas assessing the values of both the art. XII(f) distributions and the art. XIV withdrawal payments (for instance, applying the same growth factor if both formulas call for inputting that same variable).

As a final matter, we take note of the husband's argument that the special master incorrectly tax affected the Wellington partnership interest by deducting 20.3 per cent to reflect the combined Federal and Massachusetts capital gains tax rates. The special master was certainly correct to tax affect the transfer of the wife's portion of the present value of the partnership interest. See *Bernier, supra* at 790 (requiring fair mechanism "for

---

[24]For instance, the special master adjusted from four per cent to three per cent the growth rate that the wife's expert applied to Wellington's NAI, and consequently, husband's estimated art. XII(f) distributions paid from NAI. See *supra* at 385. The special master also calculated future art. XII(f) distributions using not, as suggested by the wife's expert, the most recent years (2006-2008) as representative, but instead all years since the husband became a partner, including several early years where the husband's distributions were comparatively small. Similarly, in computing the present value of the husband's art. XIV withdrawal payment, the wife's expert again applied a four per cent growth rate, and, this time, projected Wellington's future NAI in the years husband would earn withdrawal payments, by assuming that the partnership would continue to earn profits commensurate with the year 2007, which was, as noted by the husband, historically profitable.

accounting for the tax consequences of the transfer of ownership . . . from one spouse to the other"). Under the Internal Revenue Code, partnerships, such as Wellington, are pass-through entities, and as such, individual partners are "liable for income tax only in their separate or individual capacities." 26 U.S.C. § 701 (2006). In determining a partner's income tax, the partner must individually account for statutorily enumerated items, such as partnership income, gains, and losses that, in total, make up his or her "distributive share of the partnership[]." 26 U.S.C. § 702(a) (2006). The character of all items constituting the partner's distributive share is determined as if each item "were realized directly from the source from which realized by the partnership, or incurred in the same manner as incurred by the partnership." *Id.* at § 702(b). Therefore, distributions from a partnership are not uniformly subjected to either an ordinary income tax rate or a capital gains tax rate, but are itemized, with each item treated appropriately for tax purposes. See Internal Revenue Service Publication No. 541 (rev. April 2008).

In his report, the wife's expert treated the art. XII(f) distributions and art. XIV withdrawal payments as separate classes of income for tax purposes. He tax affected the future art. XII(f) distributions at 31.5 per cent, the effective income tax rate for the three representative years in his model. For the art. XIV withdrawal payment, the wife's expert applied the highest marginal tax rate of 38.5 per cent, assuming the payout would be classified under the United States tax code as "guaranteed payments." The husband's expert, who only analyzed the tax effects of the art XIV withdrawal payment, applied a forty per cent deduction to approximate the combined Federal and Massachusetts income tax rates.

It is not necessarily error that the special master tax affected at a rate different from the rates advanced by both experts. See *Fechtor* v. *Fechtor, supra* at 863 (allowing judge to reject expert opinion altogether and arrive at a valuation on other evidence). However, in rejecting the opinion of both experts as to the applicable tax rates, the special master and the judge were still obligated to provide a reasonable explanation, and here, they "failed to offer a cogent explanation of [their] choice." *Bernier, supra* at 787. The husband's argument on this point is conclu-

sory, and provides little guidance. Nonetheless, it is not clear
from the special master's brief treatment of the issue (1) why
he applied a combined capital gains tax rate in lieu of the effec-
tive income tax rates suggested by both the husband's and the
wife's experts, or some amalgamation of all applicable rates, as
this court ordered in *Bernier, supra* at 787-790, in the context
of the transfer of an interest in a close corporation; and (2) why
he applied the combined capital gains tax rate to both the
anticipated art. XII(f) distributions, and the art. XIV withdrawal
payment, when, at least in the opinion of the wife's expert, the
two sources of income would be classified differently under the
Internal Revenue Code. On remand, the judge should provide a
clearer explanation of which rates are applicable in tax affecting
this transfer of a share of the present value of the husband's
Wellington partnership interest to the wife.[25] See *Bernier, supra*
at 787; *Fechtor* v. *Fechtor, supra.*

iii. *Postseparation contribution.* The husband argues that the
wife made negligible, and negative, contributions to the marital
enterprise after the cohabitation period ended and the parties
separated in February, 2006. Here, the husband argues that the
record "discloses no sacrifices or challenging circumstances
during the litigation period that balances the burden on [the
husband] of working every day." He claims his own wealth trans-
formed the wife into a "suddenly rich woman," with a "full-time
staff of nannies and servants." He further alleges that the wife's
counsel attempted "to diminish [the husband] in the eyes of his
employer's decision-makers" by asking questions about the hus-
band's relationship with his cousin in depositions of Wellington
managers. Therefore, he argues, because the judge exercised his
discretion to consider the contributory factors listed in § 34, he
must consider this "negative" postseparation conduct, and, in
turn, reduce the wife's share of the estate. See *Savides* v.
*Savides*, 400 Mass. 250, 253 (1987) ("In considering the increase
in value of property after separation, it was not error for the
judge to exclude the wife's participation in that increase where
she made no contribution to the marriage after that time and the
increase in value was solely attributable to the husband's efforts").

---

[25]Based on the totality of the circumstances, we do not suggest that apply-
ing a combined capital gains tax rate clearly produces an arbitrary result, but
simply that the judge should provide a more detailed explanation.

The husband's denigration of the wife is not a substitute for a cognizable legal argument. The tenor and substance of his argument stands in direct contradiction to our law. See G. L. c. 208, § 34; *deCastro* v. *deCastro*, 415 Mass. 787, 794 (1993). We have always emphasized that a court should not apply "the discarded idea that the wage earner is entitled to most if not all of the benefits of the paid work." *Id.* That narrow focus is what the Legislature sought to avoid in § 34. *Id.* "The marriage-as-partnership concept, embodied in G. L. c. 208, § 34, recognizes that one party often concentrates on the financial side of the family while the other concentrates on homemaking and child care." *Id.* A judge may consider, as the judge did in this case, the genesis of an asset, but such contributions should not be unduly emphasized to the detriment of the other spouse whose contributions were primarily in the form of homemaking. *Zeh* v. *Zeh*, 35 Mass. App. Ct. 260, 266 (1993). Section 34 "must be read to apply in a broad sense to the value of all contributions of the respective spouses towards the marital enterprise." *Putnam* v. *Putnam*, 5 Mass. App. Ct. 10, 17 (1977).

Here, the judge diligently made findings on each of the mandatory factors enumerated in § 34, as required. *Rice* v. *Rice*, 372 Mass. 398, 402-403 (1977). In addition, the judge's findings clearly stated the rationale for the equal property division. The judge found that the wife's "prolonged absence from the workforce would hinder her employability," and more importantly, although this was a mid-length marriage that could conceivably warrant less than equal division of property, the wife would "continue to have child-care and custodial parenting responsibilities of the four minor children for several years into the future." The judge also exercised his discretion to weigh spousal contributions to the marital enterprise, both financially and in homemaking, and recited many of the wife's significant contributions to child care, maintenance of property, financial management, and ministerial work, both during cohabitation and after separation. He specifically found that the deposition questions concerning the husband's affair with his cousin were relevant and calculated to lead toward discoverable evidence, as is, of course, correct. The husband's argument is without merit. The equal division of property is well supported, and by no means

"plainly wrong and excessive." *Redding* v. *Redding*, 398 Mass. 102, 107 (1986), and cases cited.

iv. *Bifurcation*. The husband argues the denial of his motion to bifurcate the trial, which would have allowed an immediate judgment of divorce prior to resolution of the division of the marital estate, was a reversible error. He claims that denial of his motion cost him millions of dollars in income to which he would have solely been entitled had the marital partnership been dissolved in 2006, when he filed the motion to bifurcate, and the judge found the marriage irretrievably broken down. The decision to bifurcate is one within the sound discretion of the judge. *Dobos* v. *Driscoll*, 404 Mass. 634, 644-645, cert. denied sub nom. *Kehoe* v. *Dobos*, 493 U.S. 850 (1989) ("Driscoll points to no case in this Commonwealth in which the decision of a judge not to bifurcate a civil proceeding has been the ground for reversal. Furthermore, Driscoll has cited no such reversal by any other jurisdiction"). The husband points to no error of law or abuse of discretion, other than an outcome he disliked.

b. *Tax burdens*. The husband argues that the divorce judgment misallocated the tax burdens, and places all liability on him for deferred Federal and State taxes on income he received from Wellington, and then shared with the wife. He claims that the judge "ignored" the issue of taxes. This argument is advanced in one sentence and one footnote in his brief. It is not a reasoned legal argument, and the citations are inadequate to provide the required factual support in the record to elucidate how specifically he claims the judge erred. The bald assertion that the judge "ignored" the assignment of liability, as § 34 requires, is demonstrably incorrect. See G. L. c. 208, § 34 (judge "shall consider . . . liabilities and needs of each of the parties"). The judge expressly provided: "Each party is responsible for his or her respective liabilities as reported on his and her Financial Statements." We conclude that the husband's abbreviated and conclusory claim does not rise to the level of an appellate argument as defined by Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). Therefore, we do not consider it.

c. *Child custody and support*. The husband claims that we must remand for the judge to reconsider the issue of child custody. The husband's pretrial motion for shared physical custody

was denied, and the issue was reserved for trial. This motion came after the husband stipulated that the children's primary residence would be with the wife. Regardless of the stipulation, the trial judge examined the issue of custody, contrary to the husband's conclusory assertion that he "refused erroneously to consider or try shared physical custody." The judge awarded joint legal custody, but found it in the "best interests of the parties' children to reside primarily with [the wife], who has been the primary caregiver throughout the marriage."

In any proceeding involving custody of a child, "as matter of law and as matter of humanity," *Hersey* v. *Hersey*, 271 Mass. 545, 555 (1930), the governing principle guiding a judge's decision-making is to ensure custody rests with the parent who will promote the "child's best interests." *Custody of Kali*, 439 Mass. 834, 845 (2003), quoting *Rosenberg* v. *Merida*, 428 Mass. 182, 191 (1998). Here, the judge made numerous subsidiary findings that strongly supported his conclusion that awarding sole physical custody to the wife was in the best interests of the children.

The husband also attacks the propriety of the judge's imposition of $27,100 per week ($116,530 per month) in child support obligations. He argues that the judge should have required the wife to share in the costs of child support. Otherwise, he claims, the child support is "tax-free alimony in disguise." While the husband's argument lacks clarity or further support, our analysis reveals no error in the award of child support.

By statute, Massachusetts fixes child support guidelines. "Where a noncustodial parent's income level exceeds the children's basic needs, the minimum amount provided in the guidelines is presumptively correct, and the court may deviate upwards in the amount warranted by the circumstances." *Pearson* v. *Pearson*, 52 Mass. App. Ct. 156, 160 (2001), citing *J.C.* v. *E.M.*, 36 Mass. App. Ct. 446, 450 & n.6 (1994). A child's "needs are to be defined, at least in part, by their parents' standard of living and . . . children are entitled to participate in the noncustodial parent's higher standard of living when available resources permit." *Brooks* v. *Piela*, 61 Mass. App. Ct. 731, 737 (2004), citing *Department of Revenue* v. *Mason M.*, 439 Mass. 665, 677 (2003). Thus, the large sum awarded by the judge was not unreasonable or an abuse of his discretion.

Massachusetts has also looked with disfavor at so-called "double dipping," a term used to describe "the seeming injustice that occurs when property is awarded to one spouse in an equitable distribution of marital assets and is then also considered as a source of income for purposes of imposing support obligations." *Adlakha, supra* at 865 (2006), quoting *Champion* v. *Champion*, 54 Mass. App. Ct. 215, 219 (2002). However, we decline to disturb an award of child support for inequitable "double dipping" where it is possible to "identify separate portions of a given asset of a divorcing spouse as the separate bases of the property assignment and any alimony or support obligations." *Dalessio* v. *Dalessio*, 409 Mass. 821, 828 (1991).

Here, it is possible for us to identify the separate sources of the husband's income being paid to equitable distribution and to child support. The judge, and derivatively the special master, excluded the husband's art. XII(b) salary and incentive compensation when capitalizing his projected share of the Wellington partnership profits for the purposes of present valuation (including only the art. XII(f) distribution and the art. XIV withdrawal payment). Thus, the source of the equitable distribution is distinct from the millions of dollars in expected art. XII(b) compensation payments attributable to the support obligations. Therefore, there was nothing improper in including the Wellington partnership interest in the marital estate, and then counting the remainder of its excluded income for child support purposes.[26] *Id.*

3. *Conclusion.* We vacate that portion of the judgment in the divorce action presently valuing the husband's Wellington partnership interest at $80,956,975, and remand for further proceedings directed solely at valuing that interest consistent with this opinion. In all other respects, the judgment of divorce is affirmed.

*So ordered.*

IRELAND, J. (concurring in part and dissenting in part, with

---

[26]The husband's art. XII(b) compensation has been as low as $45,262 and as high as $21,088,221 since he joined the partnership in 1993. We acknowledge this variability. If his obligations prove too burdensome in the future, an award of child support, unlike the equitable distribution of the marital estate, may be modified. G. L. c. 208, § 37.

whom Spina, J. joins). I concur in the result and agree fully with the reasons stated in the court's opinion for reaching the result. I share Justice Spina's concern, however, that the impoundment issue has not been resolved correctly.

When we released this opinion initially we did not address the impoundment issue. That was an oversight that was quickly brought to our attention by the partnership's counsel. We decided that the best course was to withdraw the opinion immediately and until we resolved the matter. We then solicited the parties' views and the partnership's view on whether the order of impoundment should remain intact. The court has now concluded that the impoundment order should be vacated to the extent of making public the financial details contained in the opinion, while leaving the rest of the record impounded. *Ante* at 362 n.1.

I would have left the impoundment order intact. The impoundment — which was preceded in the trial court by a comprehensive protective order agreed to by both sides and the partnership, covering much of the same material — was approved by a judge in the Probate and Family Court on motion of the partnership, supported by a lengthy and very detailed affidavit. The partnership made a strong case for the protection of its information. The partnership reasonably relied on the order. The case was tried as an impounded case. The clerk of this court then properly carried the impoundment forward on appeal, and the case file was closed from public inspection. See S.J.C. Rule 1:15, § 2 (b), as appearing in 401 Mass. 1301 (1988). The parties also treated the case as impounded on appeal: they clearly indicated on their briefs that this was an "Impounded Case"; and at oral argument their counsel were careful not to refer to the parties or the partnership by name. See *id.* at § 2 (c). The propriety of the impoundment was not an issue raised by either party on appeal. No one else was challenging the order or asking that it be vacated in whole or in part. I do not think it is fair to the partnership for the court in these circumstances to vacate the order on its own initiative.

I recognize that the impoundment order was not perfect. It appears to have been issued without express findings of good cause, and it was broader than strictly necessary to protect the partnership's information. Reasonable minds can differ as to the specific infirmities, but I do not think the order was so egregious

that we needed to reach out affirmatively and lift it on our own. In the spirit of what was intended, we could have and should have found alternative ways to deal with the imperfections. If we were concerned about the absence of express findings, we could have remanded the impoundment aspect of the case to the probate judge who issued the impoundment order, for him to make the necessary findings. We could have used pseudonyms for the parties and the partnership or, as Justice Spina appropriately suggests, we could have had a full discussion of the issues on appeal without revealing impounded details. *Post* at 398-399 (Spina, J., concurring in part and dissenting in part). We also could have included in the opinion cautionary language for litigants, attorneys, and judges in future cases, stressing the need for them to comply with the letter and spirit of the rules on impoundment; reminding them that overbroad impoundments are subject to challenge; and warning them that such impoundments might even be revised by the court on its own initiative. I would not have thought it necessary, however, to do on our own in this particular case what no party or interested third person was asking us to do: undo the impoundment. The court's approach in lifting the impoundment on its own, at such a late stage in the proceeding, is unnecessarily harsh in my view and unnecessarily exposes some of the partnership's sensitive (heretofore impounded) financial information.

Given the court's ruling, it may make sense for our rules committee to reexamine the rule on impounded appeals, S.J.C. Rule 1:15. I am concerned that the rule as it is currently written may give parties and nonparties who have obtained impoundment orders in the trial court a false sense of assurance that the impoundment will be honored by the appellate court if it is not being challenged. Perhaps the rule should be changed to require one who has obtained an impoundment order in the trial court to apply anew to the appellate court for impoundment of the appeal. At a bare minimum, the existing rule should be amended to make it more clear that the appellate court can vacate an impoundment on its own initiative at any point during the appellate process, after giving those involved an opportunity to be heard, as was done here.

As for this particular case, the unfortunate timing of the initial release of the opinion was, as it turns out, inconsequential.

Had the court addressed the impoundment issue in the opinion initially, as we should have done, the outcome (in terms of vacating the impoundment to the limited extent of what has been said in the opinion) would have been the same, given the court's view.

SPINA, J. (concurring in part and dissenting in part, with whom Ireland, J., joins). The only aspect of the court's opinion with which I disagree is the question of impoundment. While the Probate and Family Court judge's order impounding the entire case was overbroad, I would not have disturbed that order because no party raised the issue on appeal, and no third person has sought leave to intervene seeking access to the record in this case. See Rule 10 of the Uniform Rules on Impoundment Procedure 875 (LexisNexis 2010-2011) ("A party or any interested third person . . . may, by motion supported by affidavit, seek to modify or terminate an order of impoundment"). Impoundment is an interlocutory order. See *Republican Co.* v. *Appeals Court*, 442 Mass. 218, 223-224 (2004). As such, it is open to challenge at any time, whether that be here, when the case is on appeal, or in the trial court at any other time. There has been no challenge to the impoundment order.

The materials that originally were sought to be impounded were provided during the discovery phase of this case. Generally, such materials are not judicial records and may be impounded per se. See *Seattle Times Co.* v. *Rhinehart*, 467 U.S. 20, 30 (1984). Massachusetts applies the factors set forth in Mass. R. Civ. P. 26 (c), as amended, 423 Mass. 1401 (1996), which include protection from "annoyance" or "embarrassment," to these materials. See Rule 1 of the Uniform Rules on Impoundment Procedure, *supra* at 872. If impounded materials are used at trial, they become judicial records to which the public has a strong common-law right of access. Such records may be impounded "for good cause." Rule 7 of the Uniform Rules on Impoundment Procedure, *supra* at 874.

Third parties who are not before the court and who are not responsible for the initiation of the underlying litigation may have privacy rights sufficiently compelling to justify impoundment of their financial records and their identity. See *In re Knoxville News-Sentinel Co.*, 723 F.2d 470, 477-478 (6th Cir.

1983). See also *In re Application of Newsday, Inc.*, 895 F.2d 74 (2d Cir.), cert. denied sub nom. *Gardner* v. *Newsday, Inc.*, 496 U.S. 931 (1990). The husband's employer has such rights.

In this case, the husband's employer filed a motion for impoundment supported by affidavit.[1] The employer indicated it is a private company that has a financial relationship with its partners that is strictly confidential and unavailable to the public. It further stated that maintaining this confidentiality, as well as the confidentiality of its financial information, its compensation and benefits structure, and its financial relationship with its partners, including the husband, is critical to its success as a business, its recruitment strategies, and its competitive advantage over its publicly traded competitors. It also indicated that its partners, except the managing partners, do not know the levels of compensation of other partners, which is essential to the maintenance of internal collegiality and meritocracy. The court appears to recognize the validity of the employer's claims because it did not vacate the entire impoundment order. Instead, it lifted the order as to information it considers "necessary to the resolution in the case." *Ante* at 362 n.1.

The court's opinion in this case does not depend on a discussion of specific financial figures, or, for that matter, disclosure of specific details of the employer's partnership agreement. The issues on appeal could have been discussed in a meaningful manner without revealing impounded details. The latter category is particularly troublesome because it is that information, namely, the method by which a partner's income is calculated, which lies at the heart of the employer's privacy interest. The order vacating the impoundment order not only has a profound impact on the employer's business model of keeping partner finances confidential, but it will likely have adverse effects on the employer's competitive advantage over publicly traded rivals, recruitment of new employees, and collegiality and meritocracy of the partnership. The court's discussion of specific valuation of the employer itself, for purposes of a divorce case, is unnecessary in this case, and it may pose serious consequences to the employer's business, as well as the security of its employees and their

---

[1]The employer also had submitted a proposed order of impoundment of confidential documents and confidential information. The judge did not sign the proposed order, but instead impounded the entire case.

families. This is particularly questionable where we have said that the methodology used to determine valuation and adopted by the judge was clearly erroneous. *Ante* at 386-390.

The employer has, in my view, a significant privacy interest in this information that outweighs the public's interest in its inspection. It is, essentially, an innocent nonparty with a reputation to protect, and it is difficult to imagine a more compelling case. Through no fault of its own, it has been denied several options, including termination of the husband's interest in the company, in order to prevent disclosure. I would not have vacated the impoundment order, disclosed any financial figures, or disclosed terms of the partnership agreement (except generally), or disclosed the name of the husband's employer. I respectfully dissent from that aspect of the court's decision.