## JUDITH E. BERNIER *vs.* STEPHEN A. BERNIER
(and a companion case[1]).

No. 11-P-394.

Dukes. January 11, 2012. - June 29, 2012.

Present: GRASSO, FECTEAU, & SULLIVAN, JJ.

*Divorce and Separation,* Division of property, Attorney's fees. *Corporation,* Close corporation, Valuation. *Damages,* Interest. *Interest.*

In a divorce judgment in which the husband would receive ownership of S corporations (two supermarkets) he owned equally with the wife, and the wife would be required to relinquish all ownership in the businesses, the judge, on remand, erred in failing to value the corporations consistently with the mandate of the Supreme Judicial Court (i.e., utilizing a zero percent tax affecting rate arrived at through application of all applicable rates, as the Supreme Judicial Court ordered in *Bernier* v. *Bernier*, 449 Mass. 774 [2007]); therefore, this court vacated and remanded for additional adjustments that portion of the amended judgment concerning the valuation of the supermarkets [90-92] and also treated as vacated the judge's implicit denial of the wife's request for postjudgment interest, to be revisited at the proceedings on further remand [93-95].

In the circumstances of a complaint in equity filed by the wife in a divorce action, seeking an accounting and equalization of income for a certain period from two supermarkets she jointly owned with the husband, this court failed to discern error in the judge's calculations concerning tax liability [96-97]; further, the judge did not err in declining to award the wife statutory prejudgment interest, where, in the peculiar circumstances of the case, and in the context in which the matter of income equalization arose, the judge's accounting and order for payment did not constitute an award of damages on which prejudgment interest was to be added [97-98]; finally, the judge correctly concluded that the wife was not entitled to an equalization of attorney's fees for the equity action [98-101].

COMPLAINT for divorce filed in the Dukes County Division of the Probate and Family Court Department on June 12, 2000.

CIVIL ACTION commenced in the Dukes County Division of the Probate and Family Court Department on July 28, 2003.

[1]Judith E. Bernier *vs.* Stephen A. Bernier, a suit on an amended complaint in equity.

The cases were heard by *Randy J. Kaplan,* J.

*David L. Kelston (Max D. Stern* with him) for Judith E. Bernier.

*Paul M. Kane (Joan E. Kolligian* with him) for Stephen A. Bernier.

SULLIVAN, J. In *Bernier* v. *Bernier,* 449 Mass. 774, 799 (2007) (*Bernier I*), the Supreme Judicial Court vacated that portion of the third amended supplemental judgment of divorce of the Probate and Family Court valuing the parties' S corporations and remanded the matter for further proceedings concerning, among other things, the issue of "tax affecting." More specifically, the court directed the probate judge to employ "the tax affecting approach" adopted in *Delaware Open MRI Radiology Assocs.* v. *Kessler,* 898 A.2d 290, 328-330 (Del. Ct. Ch. 2006) (*Kessler*). *Bernier I,* 449 Mass. at 790. The court also vacated the judgment of dismissal in the wife's equity suit in which the wife had sought an accounting and equalization of income derived from the parties' S corporations during a specified period. *Id.* at 796-799.

On remand, and after separate trials in the divorce and equity proceedings, the probate judge revalued the S corporations and entered a fourth amended supplemental judgment of divorce dividing the assets. By a judgment on the complaint in equity, the judge ordered the husband to pay the wife a certain sum but stated that there shall be no payment of statutory interest on the money owed. The parties' appeals from the divorce and equity judgments have been consolidated in this court.

Notwithstanding the judge's thoughtful analysis of the *Kessler* approach, set out in her supplemental findings of fact and rationale in the divorce case, for the reasons discussed below we are constrained to vacate the fourth amended supplemental judgment of divorce as it pertains to the valuation of the S corporations and remand the matter again to the Probate and Family Court. We affirm the judgment on the complaint in equity.

A. *The divorce case.* 1. *Valuation of the S corporations/tax affecting.* a. *Background.* The general background of the divorce case is set out in *Bernier I* and need not be rehearsed in detail. We concentrate here on the issue of tax affecting of the S corporations and draw liberally, both in our background description and discussion of the law, from the Supreme Judicial Court's

opinion. During the marriage the parties achieved financial suc-
cess through the operation of two supermarkets that were owned
by two S corporations, of which the husband and wife each owned
one-half. *Bernier I*, 449 Mass. at 777.[2] Before the initial trial in
2002, the parties agreed to an equal division of assets. At trial,
the testimony centered principally on the value of the supermarkets,
with the parties agreeing to establish the valuation of the markets
as of December 31, 2000, the date of the last reconciliation of ac-
counts prior to trial. *Id.* at 778 & n.5. Each party presented the
testimony of an expert witness on valuation: Mark Leicester
prepared the wife's valuation, and Joel Horvitz prepared the
husband's valuation. *Id.* at 778. Although "Leicester and Horvitz
were in broad agreement on key points," including that "the
buyer of the supermarket shares would seek an investment that
would yield the buyer's required rate of return," and that the
most accurate estimate of the supermarkets' value would be
achieved by employing the "income" approach to valuation, the
experts arrived at markedly different appraisals of the super-
markets. *Ibid.* Leicester opined that the fair market value of the
supermarkets was $16,391,000; Horvitz fixed the fair market
value at $7,850,000. *Ibid.*

The discrepancy in the experts' valuations, the Supreme
Judicial Court noted, was due primarily to Horvitz's application
of "tax affecting,"[3] as well as certain other discounts to his

[2]The husband and wife, as equal shareholders, had elected that the
supermarkets be taxed under the provisions of subchapter S of the Internal
Revenue Code, 26 U.S.C. §§ 1361-1379 (2000). *Bernier I*, 449 Mass. at 782.
Unlike a traditional C corporation, the income of which is "subject to income
tax at both the corporate (or entity) level and the shareholder level on dividends,
if any, paid to shareholders . . . , the income of an S corporation is not
subject to Federal tax at the entity level . . . but is passed through and taxed
to the shareholder when earned by the corporation, whether or not the corpora-
tion pays dividends." *Id.* at 775 n.2. See *J.S.* v. *C.C.*, 454 Mass. 652, 660 n.10
(2009). The shareholders of an S corporation thus "enjoy the considerable
benefit of avoiding the 'double taxation' of corporate dividends that is the
hallmark of the C corporation." *Bernier I*, 449 Mass. at 782. The Supreme
Judicial Court demonstrated in *Bernier I* the cognizable tax benefit to S
corporation shareholders by way of an example adapted from *Kessler*. *Bernier
I*, 449 Mass. at 782 n.15. In Appendix A to this opinion, we have set out and
illustrated by chart the court's example.

[3]The Supreme Judicial Court stated that "[i]n the context of valuation of
the stock of an S corporation, 'tax affecting' is employed in what the parties

calculations of fair market value,[4] and Leicester's omission of those considerations. *Bernier I*, 449 Mass. at 778-779. The positions of the parties' experts were described by the court as follows:

> "Horvitz tax affected as if the S corporation were a C corporation, at what he termed the 'average corporate rate' of thirty-five per cent.[5] . . . He testified that tax affecting the S corporations at the C corporation rate was proper because, among other things, a person contemplating the purchase of an S corporation would factor into his probable rate of return the tax consequences of the purchase. Leicester, on the other hand, did not tax affect the supermarkets' income in his valuation because, as he testified, an S corporation, unlike a C corporation, does not pay taxes at the entity level, and because no sale of the business was contemplated."

*Id.* at 779.

The judge in the initial trial rejected Leicester's valuation as "unreliable" and "adopted substantially without change Horvitz's method of applying tax affecting and key [person] and marketability discounts to the supermarkets, and adopted his conclusion that the fair market value of the supermarkets on the relevant date . . . was $7,850,000." *Bernier I*, 449 Mass. at 780. Thereafter, the judge entered a supplemental judgment on August 18, 2003 (which was later the subject of further

---

refer to as the income approach to appraising the value of S corporation shares, by which the estimated future earnings of the corporation are discounted by imputed future tax burdens at the entity level, even though the S corporation pays no entity level earnings taxes." *Bernier I*, 449 Mass. at 775 n.2, citing *Gross* v. *Commissioner of Int. Rev.*, 272 F.3d 333, 344-347 (6th Cir. 2001), cert. denied, 537 U.S. 827 (2002).

[4]Horvitz additionally discounted the fair market value of the supermarkets by applying "key [person]" and "lack of marketability" discounts. *Bernier I*, 449 Mass. at 779. The Supreme Judicial Court ultimately determined that these discounts were not appropriate in the present case. *Id.* at 790-792. On remand, neither of the parties' experts made adjustments for these particular discounts, and the discounts are not implicated in the present appeals.

[5]The Supreme Judicial Court later stated that "[t]hroughout his testimony, Horvitz was notably imprecise in explaining his use of a thirty-five per cent tax rate." *Bernier I*, 449 Mass. at 784 n.19.

supplementation), awarding the husband the option to purchase the wife's fifty percent ownership interest in the supermarkets for $3,925,000,[6] and certain other relief. *Ibid.*

On the wife's appeal, the Supreme Judicial Court concluded that the judge erred in adopting Horvitz's valuation that tax affected the fair market value of the parties' S corporations at a presumed "average corporate rate" of a C corporation. *Bernier I*, 449 Mass. at 775.[7] Applying the C corporation rate of taxation to an S corporation, the court stated, "severely undervalues the fair market value of the S corporation by ignoring the tax benefits of the S corporation structure and failing to compensate the seller for the loss of those benefits."[8] *Id.* at 776. The court reasoned that such a result was particularly misplaced in this case in view of the uncontroverted evidence that the supermarkets would continue to operate as S corporations after the parties' divorce; that they would continue to be owned by one of the existing shareholders; and that the supermarkets were profitable and would continue their historic practice of making cash distributions. *Id.* at 790. On the other hand, the court continued, in the circumstances of this divorce case, "failure entirely to tax affect an S corporation artificially will inflate the value of the S corporation by overstating the rate of return that the retaining shareholder could hope to achieve." *Id.* at 776. After review of the scant case law and pertinent literature on the subject, the court decided on an alternative approach to these two extremes and "adopt[ed] generally the metric employed by the *Kessler* court." *Ibid.*

[6]On February 2, 2004, the husband exercised his option to purchase the wife's fifty percent ownership interest in the supermarkets. *Bernier I*, 449 Mass. at 781. The parties agree that on February 4, 2004, the husband paid the wife the then-ordered value for her one-half ownership interest in the markets.

[7]The court emphasized, as a preliminary matter, that "where valuation of assets occurs in the context of divorce, and where one of the parties will maintain, and the other be entirely divested of, ownership of a marital asset after divorce, the judge must take particular care to treat the parties not as arm's-length hypothetical buyers and sellers in a theoretical open market, but as fiduciaries entitled to equitable distribution of their marital assets." *Bernier I*, 449 Mass. at 775-776, citing G. L. c. 208, § 34.

[8]On this point, the court stated, more particularly, that "the judge erred in adopting in all material respects Horvitz's valuation that tax affected at thirty-five per cent when doing so was not reasonable, as it would clearly produce an arbitrary result: a significant undervaluation of the supermarkets" (footnote omitted). *Bernier I*, 449 Mass. at 787.

As explained in *Bernier I*, *Kessler* involved a radiology practice, operating as a closely held S corporation, where the dealings between the majority and minority shareholders were constrained by fiduciary considerations. *Bernier I*, 449 Mass. at 787. Three of the eight shareholders of the corporation (the Kessler group) wanted the majority shareholders (the Broder group) to buy out their shares. *Id.* at 787-788. The parties' experts differed markedly in their valuation of the shares — the expert for the Broder group treated the S corporation as a C corporation in his valuation (applying forty per cent as the tax rate to the business's earnings); the Kessler group's expert did not tax affect earnings at all. The Delaware court found, for reasons similar to those set out by the Supreme Judicial Court, see *supra*,[9] that neither expert's testimony concerning tax treatment was fair. *Id.* at 788.

The Supreme Judicial Court then summarized the so-called *Kessler* metric or approach:

> "Having rejected the rationale and conclusions of both experts, the Delaware court proposed an alternate approach. This approach attempted to capture the tax benefit to the buyer of S corporation shares (the Broder group) of receiving cash dividends that are not subject to dividend taxes. The court observed that, as is the case here, the buyout was an 'involuntary removal,' and not an arm's-length purchase. To calculate the effect of taxes on the buyers and the sellers in these circumstances, the judge asked: if the S corporation at issue were a C corporation, at what hypothetical tax rate could it be taxed and still leave to shareholders the same amount in their pockets as they would have if they held shares in an S corporation? In other words, the judge asked what the effective corporate tax rate would be for the S corporation shareholder, although the entity itself paid no corporate tax. Assuming a dividend tax rate of fifteen per cent and a personal income tax rate of forty per cent (the shareholders were wealthy physicians who paid individual taxes at the highest rate), the court imputed a 'pre-dividend' corporate tax rate of 29.4 per cent to the S corporation.[10] The result was to leave

---

[9]The Delaware court's rationale is further explicated in note 10, *infra*.

[10]In *Bernier I*, 449 Mass. at 789, the Supreme Judicial Court added here its

the shareholder of an S corporation with the same amount of money in his or her pocket as the shareholder of a C corporation being taxed at a (fictitious) 29.4 per cent corporate tax rate. Applying this rate to the earnings of the entity measures 'with the greatest practicable precision the fair value of the . . . interest in the going concern value of' the business." (Citations and footnote omitted.)

*Bernier I*, 449 Mass. at 788-789. For an illustration of this approach, see the chart in Appendix B to this opinion.

The Supreme Judicial Court stated that although the probate judge did not have the benefit of the *Kessler* decision at the time she rendered her judgment, the judge, in the circumstances, should have looked past the "all-or-nothing" approach of the parties' experts and paid particular attention to the facts of the case over more abstract considerations. *Bernier I*, 449 Mass. at 790. The court concluded that "the metric employed by the *Kessler* court provides a fairer mechanism for accounting for the tax consequences of the transfer of ownership of the supermarkets from one spouse to the other in the circumstances of record." *Ibid.* As we have indicated, the court directed the judge, on remand on the issue of valuation, "to employ the tax affecting approach adopted in *Kessler*." *Ibid.*

b. *The proceedings on remand.* The proceedings on remand were marked by some uncertainty, and disagreement between

---

footnote 26, which provides:

"The Delaware court determined the 29.4 per cent figure by creating fictional percentages to represent Federal corporate tax at the entity level and dividend tax at the shareholder level, to arrive at the same figure that would be left in the pockets of shareholders of an S corporation after taxing one hundred dollars of earnings (i.e., sixty dollars resulting after taxing one hundred dollars of earnings at the rate of forty per cent as in our example . . . ). To derive this fictional figure, the court worked in reverse. To achieve a posttax income of sixty dollars (after corporate entity tax and dividend tax), the figure to tax would be $70.60 (fifteen per cent of $70.60 is $10.60, and subtracting the latter from the former arrives at sixty dollars). To arrive at $70.60 from the total one hundred dollars of earnings, the court subtracted 29.4 per cent, the appropriate fictional tax rate. Phrased differently, the court asked at what rate a C corporation would be taxed at the entity level to permit the shareholder to receive a distribution of sixty dollars (as he would from an S corporation) rather than the fifty-one dollars he would have received as a C corporation shareholder. That differential rate captures the benefit of ownership in the S corporation."

the parties, as to what the Supreme Judicial Court intended when it directed that the *Kessler* metric or the *Kessler* approach be applied. The uncertainty arose in large part from the fact that, as the judge explained and the parties agree, when the *Kessler* valuation was set in 2004 the applicable Federal dividend tax rate was fifteen percent. However, as the judge and the parties also concluded, the applicable dividend tax rate on December 31, 2000, the date the parties agreed was to remain the valuation date of the supermarkets, was forty percent.[11] The probate judge (the same judge who presided at the *Bernier I* proceedings) noted that the Supreme Judicial Court's decision in *Bernier I* did not address the change in the dividend rates.

The wife's business valuation expert, Howard Gordon, testified that he used the formula set forth in *Kessler* but applied the dividend tax rate that was in effect in 2000 (i.e., forty percent). This resulted, as the judge noted, in a zero percent tax affecting rate because the personal dividend tax rate at the time of the stipulated date of valuation was the same as the applicable personal income tax rate, forty percent. For illustration, see the chart contained in Appendix C to this opinion. Utilizing a tax affecting rate of zero percent, Gordon valued the supermarkets at a combined value of $14 million.

David Merfeld, the husband's tax expert,[12] took a different approach. In his report, which was an exhibit at trial, Merfeld stated that S corporation income flowing out to the shareholders of the two markets is subject to Federal and State tax as ordinary income. Merfeld, the judge found, thus applied a 5.85 percent Massachusetts State tax based upon the tax on income allocable to an individual residing in Massachusetts in 2000, and a 39.6 percent Federal tax rate as in effect for tax year 2000. The

[11]There was a change in the Federal taxation of dividends between 2000 and 2004. See Jobs and Growth Tax Relief Reconciliation Act of 2003, Pub. L. No. 108-27, 117 Stat. 752. See generally Bank, Dividends & Tax Policy in the Long Run, 2007 U. Ill. L. Rev. 533, 533-534 & nn.1, 11; Internal Revenue Service Publication No. 553, at 2 (rev. Jan. 2004). See also Internal Revenue Service Publication No. 550, at 19 (2000); Internal Revenue Service Publication No. 550, at 19-21 (2004).

[12]Merfeld is a certified public accountant who does primarily tax planning and tax return preparation with some financial statement preparation and litigation support. He has no experience in business valuation or the valuation of S corporations. The judge qualified him as a tax expert.

judge stated that, in total, Merfeld tax affected the value of the markets at approximately forty-six percent by combining the State and Federal individual tax rates.[13] Merfeld ultimately valued the markets at $9,349,193.

Finding that both parties "took unreasonable positions in regards to their interpretation of the [Supreme Judicial Court's] ruling" in *Bernier I*, the judge rejected both experts' new valuations for the markets. More specifically, the judge found that the Gordon valuation, which utilized a zero percent tax affecting rate, overlooked the Supreme Judicial Court's "clear mandate[]" that "not tax affecting the valuation was unfair."[14] The judge stated that she did not agree that the intent of the Supreme Judicial Court "was to literally plug in the formula utilized in *Kessler* if in fact the tax rate was substantially different and would have resulted in a [zero percent] tax [affecting] rate." Similarly, the judge found that Merfeld's valuation ignored the import of the court's decision in *Bernier I* that (in the probate judge's view) any tax affecting rate above the rate of thirty-five per cent would undervalue the markets. The judge stated that to adopt a tax affecting rate of forty-six percent, which is higher than the husband's originally proposed "corporate tax rate" of thirty-five percent[15] (a percentage, the judge indicated, the Supreme Judicial Court determined to be "too high") "would lead to an even more significant undervaluation of the supermarkets."

Having rejected the opinions of valuation of the parties' experts, the judge arrived at a different valuation of the supermarkets. Stating that the Supreme Judicial Court, in adopting

---

[13]The exhibits reflect that Merfeld also applied a Massachusetts S corporation tax at the entity level (as in effect in the year 2000) of 4.50 percent.

[14]In support of her position, the probate judge pointed, among other things, to the following language in the Supreme Judicial Court's discussion of *Kessler* in *Bernier I*: "On the other hand, the judge in *Kessler* reasoned, not tax affecting at all was also unfair, because it would lead to a windfall for the minority sellers. '[Denying] the reality that each shareholder owes taxes on his proportional interest in [the business] would result in the [Kessler group] receiving a higher per share value from the court than it could ever have realized as a continuing shareholder.' " *Bernier I*, 449 Mass. at 788, quoting from *Kessler*, 898 A.2d at 328-329. This would be the result, the probate judge stated, were she to accept Gordon's valuation.

[15]See note 5, *supra*, and accompanying text.

the metric of the *Kessler* court, found that the application of a tax affecting rate of 29.4 percent was appropriate, the judge determined that she would use that tax rate in order to calculate the value of the markets. Indeed, the judge stated that the tax affecting rate of 29.4 percent was the only rate that she could apply to the valuation of the markets in the light of the Supreme Judicial Court's reliance on *Kessler*. Using a tax affecting rate of 29.4 percent, the judge found that the supermarkets had a combined total value of $11,366,129.

By a fourth amended supplemental judgment of divorce dated September 1, 2009, the judge ordered that the husband purchase the wife's fifty percent interest in the markets for the sum of $5,683,065. The husband was provided sixty days in which to pay the wife the sum of $1,758,065, representing the difference between the fifty percent payment under the third amended supplemental judgment ($3,925,000)[16] and fifty percent of the value of the markets as found by the court on remand ($5,683,065).[17] The judge also ordered the husband to pay the wife the sum of $328,529, in order to equalize certain attorney's fees and costs paid by the markets.

c. *Analysis.* On appeal, each party claims error in the judge's valuation of the supermarkets. The wife takes the position that the judge, on remand, was required to follow strictly the mandate of the Supreme Judicial Court to apply, in valuing the supermarkets, the method defined by the *Kessler* court, and that the judge "essentially ignored *Kessler's* method and the formula it and the Supreme Judicial Court adopted, and instead . . . , and incorrectly, used the tax rate that the *Kessler* court applied in the case before it," a rate which was predicated on a valuation date of 2004, not 2000. The husband, while acknowledging that a strict application of the *Kessler* metric (applying tax rates for the year 2000) results in a zero percent tax affecting rate,[18]

---

[16]See note 6, *supra*, and accompanying text.

[17]The parties agree that the husband paid the wife the sum of $1,758,065 on March 1, 2010, and appear to be in substantial agreement that the husband paid the wife interest on that sum (for the period from about October, 2009, to March 1, 2010), as calculated by the Probate and Family Court in a subsequent judgment of contempt dated May 17, 2010.

[18]The husband states in his brief that "this result would be technically accurate strictly on the basis of mathematics."

argues that *Bernier I* (and *Kessler*), and the Supreme Judicial Court's later decision in *Adams* v. *Adams*, 459 Mass. 361, 388-390 (2011) (involving partnership interests), stand for the proposition that subchapter S corporation earnings must be tax affected to avoid an inequitable result in the valuation process. In the husband's view, the "accident of timing" with respect to applicable tax rates should not control the outcome of this case. The husband argues that to avoid the "apparent inequities when the '*Kessler* metric' is applied strictly on the basis of pure mathematics," the "tax rate to be applied by the trial court in tax affecting the valuation" of the supermarkets should be the Federal and State tax rates that were in effect in 2000 (i.e., an entity level tax of 4.5 percent [see note 13, *supra*], the Massachusetts individual income tax of 5.85 percent, and the Federal individual income tax of 39.6 percent).

While resolution of the issue is not a foregone conclusion, in interpreting *Bernier I*, we think the wife presents the more cogent position. Consequently, we reject the approaches taken by the judge on remand and by the husband, both on remand and on the appeal.

As we have stated, the Supreme Judicial Court adopted generally the metric employed by the *Kessler* court and directed the judge, on remand on the issue of valuation, to apply the tax affecting approach adopted in *Kessler*. The wife's expert, Gordon, as both the judge and the husband appear to acknowledge, utilized the *Kessler* metric in valuing the markets. Strictly speaking, the valuation proffered by Gordon is consistent with the Supreme Judicial Court's mandate.[19] Furthermore, application of the *Kessler* metric, even if it results (as in the present case) in a zero percent tax affecting rate, does not necessarily lead to an inequitable result. There is a distinction to be drawn between failing to tax affect at all the earnings of the supermarkets because an S corporation does not pay Federal taxes at the entity level (a basis for the approach taken by the wife's expert, Leicester, in *Bernier I*), and utilizing a zero percent tax affecting rate arrived at through application of "all applicable rates, as [the Supreme Judicial Court] ordered in *Bernier [I]*." *Adams*

---

[19]The husband indicated in his brief, and he conceded specifically at oral argument, that his approach to valuation does not adhere to the *Kessler* metric.

v. *Adams*, 459 Mass. at 390. See note 21, *infra*. The *Kessler* metric, as we have stated, attempts to capture the tax benefit to the buyer of S corporation shares of receiving taxable cash dividends that were not already taxed at the corporate level. *Bernier I*, 449 Mass. at 788. It does so by "calculat[ing] the effect of taxes on the buyers and the sellers," to wit, the judge asks: "if the S corporation at issue were a C corporation, at what hypothetical tax rate could it be taxed and still leave to shareholders the same amount in their pockets as they would have if they held shares in an S corporation?" *Id.* at 789. In the instant matter, because the dividend tax rate in effect in 2000 was forty percent, a tax affecting rate of zero percent was necessary to achieve that result.[20]

At best, the husband's argument is that *Bernier I* requires generally a tax affecting *Kessler* "approach," not literal application of the *Kessler* metric. Putting to one side the fact that such an argument ignores much of the Supreme Judicial Court's tax affecting discussion in *Bernier I*, there was no evidence that the methodology proposed by the husband on remand, i.e., the combination of personal income tax rates, constituted an accepted form of tax affecting for purposes of valuing an S corporation. As we have stated, Merfeld, the husband's sole expert, was a tax expert who had never valued a business or S corporation. The husband on remand offered no expert testimony from a business valuation expert concerning tax affecting. To the extent the husband claims additional support for his valuation/tax affecting position in *Adams* v. *Adams*, *supra*, we fail to discern anything in that case that would cause us to reach a different result.[21]

---

[20]The parties agreed at the first trial in this matter, and in the proceedings on remand, that the valuation date of the supermarkets was to be December 31, 2000. *Bernier I*, 449 Mass. at 778 n.5. Data in the case were calculated as of that date. The flaw in the probate judge's use on remand of a 29.4 percent tax affecting rate (the precise figure adopted by the *Kessler* court and discussed in *Bernier I*) is that that figure assumes a dividend tax rate of fifteen percent, the rate that was in effect in 2004. *Id.* at 789. While the probate judge clearly sought to reach what she viewed as an equitable result in this difficult and complex case, her ultimate determination of the value of the supermarkets, which utilizes a 29.4 percent tax affecting rate, cannot stand, because the 29.4 percent tax rate bears no relationship to, and is contrary to, the parties' stipulated valuation date of December 31, 2000.

[21]In *Adams*, 459 Mass. at 388, the special master tax affected (by deducting

2. *Postjudgment interest on new valuation of markets.* The Supreme Judicial Court's orders for remand in *Bernier I* contain no direction with respect to the calculation of interest on the judgment.[22] In various papers filed at the proceedings on remand, the wife requested interest on the new valuation of the markets, citing at one point to G. L. c. 235, § 8 (providing, inter alia, "[e]very judgment for the payment of money shall bear interest from the day of its entry . . ."), as appearing in St. 1983, c. 652, § 2. See *Karellas* v. *Karellas*, 54 Mass. App. Ct. 469, 471 (2002) ("A judgment is the act of the trial court finally adjudicating the rights of the parties including a decision by the court that a party shall recover a sum certain"). Interest under the statute is paid as "compensation for delay." *Trinity Church in the City of Boston* v. *John Hancock Mut. Life Ins. Co.*, 405 Mass. 682, 684 (1989). Although the fourth amended supplemental judgment of divorce is silent with respect to interest, the judge, as the wife points out, stated at the hearing on the husband's later motion to stay judgment, "[T]hat's why I did not award interest on this money, which normally I would have,

20.3 percent to reflect the combined Federal and Massachusetts capital gains tax rates) the transfer of the wife's portion of the present value of the partnership interest in issue. The special master did not tax affect at the effective income tax rates suggested by the experts for the parties. While noting that it was not necessarily error that the special master tax affected at a rate different from the rates advanced by both experts, the court stated that it was not clear why the special master had "applied a combined capital gains tax rate in lieu of the effective income tax rates suggested by [the parties' experts], *or some amalgamation of all applicable rates, as this court ordered in* [Bernier I, *449 Mass. at 787-790], in the context of the transfer of an interest in a close corporation*" (emphasis supplied). *Adams*, 459 Mass. at 390. The court remanded for further explication. It is implicit in the language of *Adams* that what was contemplated and ordered by the court in *Bernier I* was something different from a combination, or stacking, of personal tax rates.

[22]We note that Rule 37 of the Federal Rules of Appellate Procedure, as amended effective Dec. 1, 1998, provides: "(a) When the Court Affirms. Unless the law provides otherwise, if a money judgment in a civil case is affirmed, whatever interest is allowed by law is payable from the date when the district court's judgment was entered[;] (b) When the Court Reverses. If the court modifies or reverses a judgment with a direction that a money judgment be entered in the district court, the mandate must contain instructions about the allowance of interest." Rule 37(a) finds expression in our case law. See *Thomas O'Connor & Co.* v. *Medford*, 20 Mass. App. Ct. 761, 765 n.6 (1985), and cases cited. There is no Massachusetts analogue for rule 37(b). *Ibid.*

I think, because of the uniqueness of the issue."[23] It would appear that the wife's request for interest was implicitly denied by the judge.

The wife, invoking both Massachusetts and Federal authority,[24] argues that the probate judge erred in failing to order postjudgment interest on the $1,758,065 award to her pursuant to the new valuation of the markets for the period from the initial supplemental judgment on August 18, 2003, to the entry of the fourth amended supplemental judgment on September 1, 2009[25] (see the discussion in part A.1.b, *supra*). The wife asserts that this court should reverse and remand the matter to the Probate and Family Court with an order that she is entitled to postjudgment interest on any payment "attributable to the valuation of the markets made pursuant to appellate and/or remand proceedings."

As we are vacating that portion of the fourth amended supplemental judgment concerning the valuation of the supermarkets (under which the figure of $1,758,065 was derived) and remanding the matter for additional adjustments, we also treat as vacated the implicit denial of postjudgment interest on the specific amount awarded. In the circumstances presented here, where (among other things) new orders concerning the valuation of the markets and the payments to be made by the husband have yet to enter,

---

[23]The parties disagree as to the meaning of the judge's comment, in context, and what the judge was referring to when she explained that she did not award interest.

[24]See, e.g., *Thomas O'Connor & Co.* v. *Medford,* 20 Mass. App. Ct. 761, 765 n.6 (1985); *Cordero* v. *De Jesus-Mendez,* 922 F.2d 11, 16 (1st Cir. 1990) ("In general, where a first judgment lacks an evidentiary or legal basis, postjudgment interest accrues from the date of the second judgment; where the original judgment is basically sound but is modified on remand, post-judgment interest accrues from the date of the first judgment"). See also *Loughman* v. *Consol-Pennsylvania Coal Co.,* 6 F.3d 88, 97 (3d Cir. 1993) ("The standard for determining whether post-judgment interest should run from the original judgment is well established. . . . [T]he decision turns on the degree to which the original judgment was upheld or invalidated on appeal").

[25]There is some uncertainty in the wife's brief as to the time frames in which she is asserting her entitlement to postjudgment interest. Notwithstanding her statement in the "argument" section of her brief that the judge erred by failing to order interest on the $1,758,065, from August 18, 2003, the wife indicates in the "conclusion" section of her brief that she is entitled to interest from February 4, 2004. Similarly, although the wife indicates at one point in her brief, as we have stated, that postjudgment interest should run to September 1, 2009, she states at another point that it should run to March 1, 2010.

there are uncertainties with respect to the time frame in which the wife seeks interest (see note 25, *supra*), and there is no indication the probate judge was afforded the opportunity to consider the specific arguments (and authorities) now advanced by the parties, we think the question of postjudgment interest should be revisited by the probate judge at the proceedings on further remand.

B. *The equity case.* 1. *Background.* As explained in *Bernier I*, the parties entered into stipulations for temporary orders during the divorce that provided, among other things, that both "would continue to own the supermarkets and equally share their profits during the pendency of the divorce." *Bernier I*, 449 Mass. at 796. The net income of the supermarkets was equalized through the end of 2000, leaving unequalized income of about $3.6 million yearly for the period from January 1, 2001 (the day after the last reconciliation of the parties' accounts), to February 2, 2004 (the date the husband exercised his option to purchase the wife's ownership interest in the supermarkets), "during which the wife continued to be a fifty per cent shareholder of the supermarkets." *Ibid.* Following a corporate meeting of the supermarkets on July 10, 2003, at which the husband asserted that the income of the supermarkets was entirely his, the wife, on July 28, 2003, filed a complaint in equity (later amended) seeking, among other things, "an accounting and equalization of income for the post-2000 period."[26] *Ibid.* In July, 2004, the judge dismissed the wife's equity action, stating, inter alia, that the wife's claims were barred under the doctrine of claim preclusion. *Id.* at 797. On the wife's appeal, the Supreme Judicial Court vacated the judgment of dismissal and remanded for further proceedings. *Id.* at 799. More specifically, the court concluded that the judge's actions and rulings in the case "effectively deprived the wife of a reasonable opportunity to bring the issue of income equalization during the post-2000 period

[26]The amended complaint in equity contained four counts: (1) request for an accounting and an order for appropriate payment to the wife; (2) breach of fiduciary duty; (3) waste of corporate assets; and (4) constructive trust.

The Supreme Judicial Court noted that the wife had also sought, unsuccessfully, to introduce the matter of income equalization through a complaint for contempt and a motion to amend the divorce judgment on property division. See *Bernier I*, 449 Mass. at 796-797, for a full description of the chronology and actions taken by the wife.

before the court at an appropriate juncture, and that the equity complaint was therefore wrongfully dismissed." *Id.* at 796.

Following a trial on the amended complaint in equity, where the issue was the equalization of the net income of the markets during the period in question,[27] the probate judge, by a judgment dated September 1, 2009, ordered the husband to pay the wife the sum of $762,375.30 on her claim for an accounting, and stated that there shall be no payment of statutory interest on the money owed. The judge dismissed with prejudice the remaining counts of the amended complaint (see note 26, *supra*). Both parties have appealed.

2. *Tax liability.* In arriving at the amount to be paid to the wife, the judge considered "what deduction should be made from the market[s'] net distributable income for income taxes between 2002 [and] 2004."[28] The husband and wife filed individual tax returns in those years, and the husband paid the taxes on all of the income for all of the business entities, including the markets. It was the wife's position at trial that the judge should not deduct the actual taxes paid by the husband for 2002, 2003, and 2004. Rather, the wife argued that the deduction for taxes should be based on a hypothetical tax she would have paid if her share of the distributable income had been paid to her in each calendar year. The parties agreed that, if the judge were to utilize the wife's tax rate for her one-half of the income in the years at issue, her taxes would have been $245,279 less than the husband actually paid.[29] The wife claimed that this was a loss for which she should be compensated, a claim the judge rejected.

Contrary to the wife's assertion, we fail to discern error in the judge's failure to, essentially, credit her with the additional sum of $245,279. Among other things, the judge noted that the parties had entered into various stipulations that became orders of the court, which required the husband to make tax payments

---

[27]At trial, the wife claimed that she was owed $1,082,785.80; the husband put the figure at $509,816.30.

[28]The parties filed joint tax returns in 2001.

[29]The $245,279 figure represents "excess taxes" purportedly paid by the husband in the amount of $50,848 for the tax year 2002, $190,142 for the tax year 2003, and $4,289 for the tax year 2004. The amount for the 2004 tax year borders on de minimis.

for the supermarkets. Those stipulations were in effect until August 18, 2003, when the supplemental judgment of divorce was entered. The judge found specifically that the husband relied on these stipulations, as well as various judgments of the court that did not change his obligation to pay all corporate taxes, in paying estimated and final taxes (the taxes accrued in 2002 and 2003).[30] That the husband's final tax returns for 2002 and 2003 were actually filed after the wife filed her complaint in equity on July 28, 2003, and after the divorce judgment entered on August 18, 2003, does not, in our view, require a different result.

3. *Prejudgment interest.* The wife argues that she was entitled to, and the judge erred in failing to order, statutory prejudgment interest pursuant to G. L. c. 231, § 6C (interest added to damages in contract actions), § 6H (interest on damages not otherwise provided by law), and § 6B (interest added to damages in specified tort actions),[31] on the equalization payment of $762,375.30, from July 28, 2003, to the date of the equity judgment, September 1, 2009. See *O'Malley* v. *O'Malley*, 419 Mass. 377, 381 (1995) (section 6C, concerning prejudgment interest in contract actions, commands a ministerial act in which interest attaches automatically). In the wife's view, the husband was found to have long owed her the sum of $762,375.30, and the accounting and payment could only be ordered as a result of breach of agreement (the parties' stipulations or the parties' S corporation agreements) or "breach of fiduciary duty/restitution." We fail to discern error, for the reasons set out below.

As the husband suggests in his brief, the complaint in equity in this case cannot be viewed in a vacuum; it arises from the marital relationship and the divorce proceedings, which called for a division of the marital assets. As we have indicated, the Supreme Judicial Court in *Bernier I* set out the chronology of the wife's attempts, through different procedural vehicles filed within a short period of time, to introduce the matter of income

[30]The judge noted also that the wife did not seek an order for instructions as to how the taxes were to be paid.

[31]"Damages" has been defined as "the word which expresses in dollars and cents the injury sustained by a plaintiff." *Rood* v. *Newberg*, 48 Mass. App. Ct. 185, 195 (1999), quoting from *Turcotte* v. *DeWitt*, 333 Mass. 389, 392 (1955).

equalization. See note 26, *supra.* Among other things, the wife moved specifically to amend the divorce judgment on the property division after her complaint in equity had been filed (appending to her motion a copy of the equity complaint) to provide for equalization of the supermarkets' income.[32] *Bernier I,* 449 Mass. at 796-797. Such an approach would presumably call for the income equalization to be effectuated through a property division — it would not constitute an award of damages. Had the wife been successful on her motion, it is difficult to perceive how she would have been entitled to prejudgment interest on the equalization amount. See *Karellas* v. *Karellas,* 54 Mass. App. Ct. at 474.

Through her alternate request for an accounting and an order for payment in her equity action (the dismissal of all other counts is not challenged on the appeal) the wife sought, similarly, to equalize the markets' income. However, the wife now appears to characterize the judge's income equalization award as damages under the prejudgment interest statutes. In the peculiar circumstances of the case, and the context in which the matter of income equalization arose, we are not persuaded that the judge's accounting and order for payment constitute an award of damages on which prejudgment interest is to be added.

C. *Equalization of attorney's fees and costs.* At the close of its discussion of the complaint in equity in *Bernier I,* the Supreme Judicial Court commented with respect to the equalization of attorney's fees:

> "In the novel and complex circumstances of this case, we conclude that valuation of the markets and equal distribution of property are not issues that are easily separable. The parties' original stipulations provided that the supermarkets would advance the parties' attorney's fees, with the payments 'debited to the party's account who has incurred those expenses,' and that such payments would

---

[32]In discussing why principles of res judicata and claim preclusion were not applicable to the wife's complaint in equity, the Supreme Judicial Court also suggested that the issue of income equalization might have been an appropriate subject in the divorce action: "The wife could not have known in advance of the divorce judgment that that judgment would not address equalization for the post-2000 period, a matter that was clearly set before the judge months before the judgment issued." *Bernier I,* 449 Mass. at 798.

be considered loans repayable by each party on the 'final division of [the] marital assets.' The parties agreed to an equal division of the marital assets and the supermarkets. Each party has expended a considerable sum for legal representation toward the joint goal of valuing the supermarkets and dividing these assets. A final equalization of the supermarkets should incorporate the fees paid to attorneys for each party, and be treated so that each party is effectively debited with half of the attorney's fees. To fail to do so would leave the wife to pay her entire legal expenses out of her own pocket while the husband effectively would receive a windfall by simply moving money from one source under his control to another."

*Bernier I*, 449 Mass. at 798-799.

The court concluded that "the valuation of the supermarkets should be adjusted to take into account advances of legal fees for both parties since the December 31, 2000, reconciliation." *Id.* at 799.

At the proceedings on remand, the parties disagreed as to the meaning and intent of the Supreme Judicial Court's directive with respect to the "time frame" over which the attorney's fees were to be equalized. The husband argued that the probate judge was to equalize the attorney's fees through the date of the entry of the supplemental divorce judgment dated August 18, 2003. The wife took the position that the end date for the equalization period, although not specified by the Supreme Judicial Court, must be the termination of the proceedings before the Probate and Family Court, including the appeal and remand proceedings. The wife also asserted that the equalization of attorney's fees should apply to the equity case as well as the divorce case.

The judge ultimately concluded that it was the intention of the Supreme Judicial Court that the equalization of attorney's fees occur as of August 18, 2003, and, in the fourth amended supplemental judgment of divorce, ordered the husband to pay the wife, as an additional payment for her share of the business, the sum of $328,529.[33] The judge stated in her findings in the divorce case that there was nothing in *Bernier I* that would

---

[33] The judge found that from the commencement of the divorce through

entitle the wife to an equalization of postjudgment fees and fees for the equity action.

Seizing upon the language of the Supreme Judicial Court that the parties agreed to an equal division of the marital assets and the supermarkets and that "[a] final equalization of the supermarkets should incorporate the fees paid to attorneys for each party," *Bernier I*, 449 Mass. at 799, the wife argues that "where a critically important part of the equalization could only occur well after the initial judgment, it was error for the court to impose an August 18, 2003 cutoff date." Put another way, the wife asserts that the Supreme Judicial Court's rationale — the parties' equal sharing of the cost of getting a right result in these cases — logically extends the equalization through the present appeal. The wife also argues that the probate judge erred by failing to equalize the attorney's fees from the equity case, particularly where the Supreme Judicial Court ordered equalization specifically as part of its discussion in the equity case.

We agree with the probate judge that the probable intent of the Supreme Judicial Court was to equalize the attorney's (and other) fees as of August 18, 2003. At the outset, the Supreme Judicial Court made reference to the parties' original stipulation concerning the advancement to the parties of attorney's fees and the payment of those fees. That stipulation, as the probate judge noted, was dated January 10, 2001. The Supreme Judicial Court indicated that the stipulations of the parties "were entered as temporary orders to govern spending (e.g., salary, attorney's fees, and expenses) only until the divorce judgment entered."[34] *Bernier I*, 449 Mass. at 797-798. Furthermore, the court's

August 18, 2003, the supermarket entities paid legal fees, costs, and expert and professional fees in the amount of $1,202,651 on behalf of the wife. No further fees were paid for her benefit after that date. During that same period the supermarket entities paid fees and costs on behalf of the husband in the amount of $545,594.36. Any legal fees incurred after August 18, 2003, and even through January 22, 2004, the date of the third supplemental judgment of divorce, were not paid by the corporations but by the parties individually. As the total legal and other fees amounted to $1,748,246, the judge determined that a payment by the husband to the wife of $328,529 "would have each party pay $874,123 of legal fees, costs and expert fees."

[34]In a footnote in its discussion of the equity action, the court stated: "The stipulations controlled what monies the parties could take from the super-

specific concern that the husband might benefit unfairly (i.e., receive a "windfall") by simply moving "money from one source under his control to another," *id.* at 799, appears directed toward a period prior to a division of the parties' property. Finally, as the probate judge stated, the Supreme Judicial Court's directive, that the valuation of the supermarkets should be adjusted to take into account *advances* of legal fees for both parties, does not order the parties to equalize all attorney's fees and expenses incurred after monies were no longer advanced from the corporation. In the circumstances, we also agree with the judge that the wife was not entitled to an equalization of attorney's fees for the equity action.[35]

D. *Conclusion.* We vacate the portion of the fourth amended supplemental judgment of divorce concerning valuation of the parties' S corporations (as well as the implicit denial of the wife's request for postjudgment interest) and remand the matter to the Probate and Family Court for further proceedings and amendment to the judgment not inconsistent with this opinion. On remand, the judge may hold such hearings as she deems necessary. That judgment is otherwise affirmed. The judgment on the complaint in equity is affirmed.

*So ordered.*

---

markets' income from January 1, 2001, until judgment entered (which occurred on August 18, 2003): the horse farm's expenses, $2,100 per week for the wife's basic living expenses, $5,000 per week as a salary for the husband, and various other expenses." *Bernier I,* 449 Mass. at 798 n.40.

[35]The husband argues on appeal that the judge erred in calculating the adjustments to be made for payment of attorney's fees and costs. He claims that under the equalization methodology employed by the judge, the wife owes *him* the sum of $328,529. As the husband's notice of appeal was limited to the provision of the fourth amended supplemental judgment concerning the valuation and division of the supermarkets, we do not address his contention. See *Sturges* v. *Chilmark,* 380 Mass. 246, 262 (1980) ("Of course, that portion of the judgment from which no appeal was taken stands").

APPENDIX A.

General illustration of Federal income tax benefit to S Corporation share-holders, adapted from *Delaware Open MRI Radiology Assocs. v. Kessler,* 898 A.2d 290, 329 (Del. Ct. Ch. 2006) (*Kessler*), as discussed in *Bernier v. Bernier,* 449 Mass. 774, 782 n.15 (2007) (*Bernier I*). See *ante* at 83 n.2.

|                                        | C Corp | S Corp |
|----------------------------------------|--------|--------|
| Income Before Tax                      | $100   | $100   |
| Corporate Tax Rate                     | 40%    | 0%     |
| Available Earnings                     | $60    | $100   |
| Dividend or Personal Income Tax Rate   | 15%    | 40%    |
| Available After Dividends[1]           | $51    | $60    |

[1]The phrase "available after dividends" was employed in *Kessler,* and was characterized in *Bernier I* as meaning "total posttax distributions," assuming that all net earning were distributed. *Bernier I,* 449 Mass. at 782 n.15, 789 n.26.

APPENDIX B.[1]

Illustration of tax affecting approach of *Delaware Open MRI Radiology Assocs.* v. *Kessler*, 898 A.2d 290, 330 (Del. Ct. Ch. 2006) (*Kessler*) (using year 2004 tax rates), described and adopted in *Bernier* v. *Bernier*, 449 Mass. 774, 787-790 (2007) (*Bernier I*).[2] See *ante* at 87.

|  | C Corp | S Corp | S Corp Valuation |
|---|---|---|---|
| Income Before Tax | $100 | $100 | $100 |
| Corporate Tax Rate | 40% | 0% | 29.4% (tax affecting rate) |
| Available Earnings | $60 | $100 | $70.60 |
| Dividend or Personal Income Tax Rate | 15% | 40% | 15% |
| Available After Dividends[3] | $51 | $60 | $100 |

---

[1]This chart is consistent with the chart in *Kessler* and with chalk C at the trial on remand after *Bernier I.*

[2]At least one commentator has put aspects of the *Kessler* metric to formulation. See McMorrow, Consider "Tax Affecting" When Setting the Value of an S Corporation, Bus. Entities, Nov./Dec. 2008, at 36, 45.

[3]The phrase "available after dividends" was employed in *Kessler* and was characterized in *Bernier I* as meaning "total posttax distributions," assuming that all net earnings were distributed. *Bernier I*, 449 Mass. at 782 n.15, 789 n.26.

Bernier *v.* Bernier.

APPENDIX C.[1]

Illustration of tax affecting approach of *Delaware Open MRI Radiology Assocs.* v. *Kessler*, 898 A.2d 290, 330 (Del. Ct. Ch. 2006) (*Kessler*), using year 2000 tax rates. See *ante* at 88.

|                                        | C Corp | S Corp | S Corp Valuation           |
|----------------------------------------|--------|--------|----------------------------|
| Income Before Tax                      | $100   | $100   | $100                       |
| Corporate Tax Rate                     | 40%    | 0%     | 0% (tax affecting rate)    |
| Available Earnings                     | $60    | $100   | $70.60                     |
| Dividend or Personal Income Tax Rate   | 40%    | 40%    | 40%                        |
| Available After Dividends[2]           | $36    | $60    | $60                        |

---

[1]This chart is consistent with chalk D used at the trial on remand after *Bernier* v. *Bernier*, 449 Mass. 774 (2007) (*Bernier I*).

[2]The phrase "available after dividends" was employed in *Kessler* and was characterized in *Bernier I* as meaning "total posttax distributions," assuming that all net earnings were distributed. *Id.* at 782 n.15, 789 n.26.